## THE NEWPORT NEWS.

(District Court, S. D. New York. October 31, 1912.)

1. SHIPPING (§ 141*)—DAMAGE TO CARGO—"PERILS OF THE SEA."

Rough seas, although not extraordinary, are sea perils, and, if sufficient to account for damage to cargo properly stowed, the loss is within the exception of such perils in bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497–499; Dec. Dig. § 141.*

For other definitions, see Words and Phrases, vol. 6, pp. 5295–5302.

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

2. SHIPPING (§ 138*)—DAMAGE TO CARGO—HARTER ACT—ERROR IN MANAGEMENT OF VESSEL.

Cargo of iron and wire, stowed in the hold of a steamship on a voyage from New York to Buenos Ayres, on arrival was badly rusted by sea water, which entered the hold through sounding pipes extending from the deck to the bilges, normally closed at the top by brass caps screwed into the pipes. During several days of very rough seas, which washed over the deck and carried away a part of the deck load, these caps became displaced and lost, and water entered the hold to the depth of several feet. The evidence showed that the deck cargo was properly stowed, and did not cause the displacement of the caps, but that they probably became loosened by the straining of the vessel. This, the officers testified, would tend to loosen them, yet it appeared that no inspection was made of them, except when the soundings were taken each morning. There was no doubt that the vessel was seaworthy when the voyage commenced. *Held*, that the damage was proximately caused by the failure of those in charge to make more frequent inspection during the stormy weather, which was an error in the management of the vessel,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and for which she was exonerated from liability under section 3 of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]).

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.*

Statutory exemption of shipowners from liability, see notes to Nord-Deutscher Lloyd v. President, etc. of Insurance Co. of North America, 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

In Admiralty. Suit by the Sea Insurance Company and others against the steamship Newport News for injury to cargo. On final hearing. Decree for claimant.

William Harrison, of New York City, for libelants.

J. Parker Kirlin, of New York City, for claimant.

HOUGH, District Judge. On a voyage from New York to Buenos Ayres, beginning on February 7th, the Newport News carried in one of her holds a considerable quantity of manufactured iron and wire. This cargo was on the bottom, and on arrival at destination was found badly rusted, while both cargo and ship's sides showed traces of water rising, it is said, as high as six feet above the bottom.

On this voyage there was deck cargo of between 500 and 600 barrels of rosin, immediately above the hold containing the injured iron. It is admitted that during the voyage the caps or plugs of the sounding pipes, communicating between bilges below the cargo and the main deck on which the rosin was stored, had become displaced, and water had poured down these pipes, carrying with it rosin. In result the water was sufficient to cause the injury complained of, and the rosin prevented timely removal by clogging the pipes and the approaches thereto.

The caps or plugs of the sounding pipes are of brass, formed to be screwed into the top of the pipes by means of a key. When in place they are flush with a flange, which is substantially the top of the pipe, and the flange itself rises perhaps an eighth to a quarter of an inch above the deck. By the routine of ship's duty, the carpenter should remove these caps each morning, and take soundings to ascertain whether the bilges are substantially dry, and it is the duty of the carpenter, under the supervision of the first mate, to replace and screw home the caps after this investigation.

Shortly after the vessel left New York, the carpenter fell ill, and so remained for a considerable time. During his illness the first officer declares that he performed this duty himself. The deck cargo of rosin was contained in barrels, old and of no great strength.

Within 12 hours after leaving port the Newport News encountered heavy weather, which lasted almost without intermission for about two weeks. I do not think that the honesty of the logbook can be attacked, and credence is given to repeated entries such as the following:

"February 8. Strong gale, with violent squall, very high, confused seas. vessel laboring and straining heavily, and shipping huge seas fore and aft,

washing part deck cargo overboard. * * * Huge seas swept vessel, breaking away rail of coal bulkhead and port bridge deck, and washing coal overboard."

"February 11. Vessel rolling and straining heavily and shipping very heavy water over all, washing part deck cargo overboard. Shifting boards used for securing deck cargo broken and washed overboard."

"February 15. Vessel pitching and rolling heavily, and shipping very heavy water over all, breaking deck cargo adrift, and washing part overboard."

"February 21. Vessel shipped huge sea, breaking deck cargo adrift and jamming steering gear."

Further excerpts are unnecessary. The evidence identifies the period when water got into the hold as some hours before 6 a. m. of February 12th, when the log records:

"Found plugs out from sounding pipes in the Nos. 4 and 5 tanks and after bilge. Sounded them, and found 1 ft. in No. 4," etc.

Subsequent investigation at Buenos Ayres showed that there must have been far more than a foot of water in the hold, and that the reason why the additional depth was not discovered was that rosin choked the sounding pipes. It is believed (though accuracy is impossible) that water, mixed with rosin, had been pouring down these pipes for some hours before discovery. The hour of discovery and notation in the log, taken in connection with the rest of the evidence, shows that no examination was made of these plugs or caps, except in the morning of each day, when the mate, or carpenter, or both, made their rounds.

The violence of the sea was sufficient to pick up and throw overboard whole barrels of rosin, of the great weight of which articles judicial notice is taken. The barrels themselves were broken, and the contents spread over the deck, and by the breaking of barrels the compact stowage of the deck cargo was destroyed. By the time comparatively calm seas were reached, some 200 barrels of rosin had been lost out of a total of about 800.

It is evident that this damage was proximately caused by one of three things, viz.: (1) Negligent stowage of the deck cargo; (2) peril of the sea (against which the bills of lading properly protect the ship); or (3) fault or error in the management of the vessel, within section 3 of the Harter Act.

It would not be useful to recite the evidence regarding the stowage of the rosin. There is nothing in the case to contradict the statements from the ship that it was well and sufficiently stowed, securely lashed and shored, and arranged in a seamanlike and customary manner. Openings were left in the deck cargo through which the deck caps could be reached. The man who took soundings lay on his belly on one or more barrels of rosin, and, reaching down with his arm, unscrewed the deck cap, took his soundings, and screwed it up again. It is said by both the master and mate that, when a vessel labors heavily and for a long time in a sea way, it is known to mariners that deck plugs or caps will loosen, though they never personally knew of any case of their not only loosening, but coming completely out and being lost, as happened on the Newport News. From this libelants argue that it was bad stowage of the deck cargo, so to plant

it around the deck plugs as to render it possible for the barrels moving in a sea way to knock out the plugs which might become loose.

To this contention I think there are two answers: (1) That considering the stowage, and the weight of the rosin barrels, and the rarity of loose plugs, such a contingency was not to be expected; and (2) that the plugs whose absence did the damage were found to have left uninjured threads in the flanged top of the standpipe, showing, in my opinion, that no severe blows were administered to the plugs as they were loosening and coming out.

I am therefore of opinion that the stowage was not only good as to the deck cargo, but safe according to human experience for the cargo under deck.

[1] Libelants, next observing that the Newport News herself suffered no serious injury, and that no other underdeck cargo received hurt, declare that no peril of the sea within the legal meaning of that phrase has been shown. But it is to be remembered that, in order to find peril of the sea, the losses sustained need not be extraordinary, in the sense of necessarily arising from uncommon causes. Rough seas are common incidents of a voyage, yet they are certainly sea perils, and damages arising from them are within the exception, if there has been no want of reasonable care and skill in fitting out the ship and in managing her. Carver (4th Ed.) § 87. The violence of the sea here shown, acting upon a well-stowed deck cargo, is, if sufficient to proximately account for all that happened, a peril of the sea, within the opinion in The Frey, 106 Fed. 319, 45 C. C. A. 309.

[2] Of course, it is not admitted by libelants that the proven peril of the sea does proximately account for the admitted injury. Their contention that the proximate cause was bad stowage has been already disposed of, and the only other cause suggested or shown is a failure on the part of the officers and crew to keep the caps properly screwed down. It is admitted that, if properly screwed down, they were water-tight, and no difficulty is seen in screwing them down properly when lying on the rosin barrels less than an arm's length above the standpipe hole. Those in charge of the steamship say they knew that, not by any action of deck cargo, but by the ordinary straining and twisting of the ship in heavy weather, these plugs were loosened; yet I find in the evidence nothing to show that they were ever looked at more than once in 24 hours. That they did loosen, that they did get completely out, and that their loss was not discovered until after several feet of water had gotten into the hold, is practically admitted, and in my judgment the danger was not discovered sooner only because insufficient inspection was made.

It is concluded as matter of fact that the cargo itself did not and could not start the plugs. If the cargo assisted the plugs in getting out, it did it in such gentle manner as not to injure the screw thread at all. Possibly—indeed, probably—the additional weight of the deck cargo increased the working or writhing of the deck; but that was to be expected, was not in itself dangerous, and only required more frequent inspection and tightening of the deck plugs, which was not given.

It is no answer to this to say that the violence of the seas rendered inspection impossible. Nothing of the kind appears in the evidence; but, if it be true, then the peril of the sea rises to the dignity of the act of God.

It is therefore found that this damage was proximately caused by error in the management of the vessel. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. It being abundantly proven that the Newport News was seaworthy when she began her voyage, it follows that the libel must be dismissed, but, under the circumstances, without costs.