## THE CARISBROOK.

(District Court, D. Massachusetts. December 12, 1917.)

No. 772.

1. SHIPPING ☞209(3)—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT.

In order to avail himself of the exemption from liability for errors in navigation or in the management of the vessel, under section 3, of Harter Act Feb. 13, 1893, c. 105. 27 Stat. 445 (Comp. St. 1916, § 8031), a shipowner has the burden of proving affirmatively that the ship was seaworthy and properly manned, equipped, and supplied at the beginning of the voyage, or that due diligence had been exercised to make her so.

2. SHIPPING ☞124—LIABILITY FOR DAMAGE TO CARGO—ERRORS IN MANAGEMENT OF VESSEL.

Evidence held to show that due diligence was exercised by the owner to make a ship seaworthy at the beginning of a voyage, and that damage to the cargo of sugar from seawater resulted from an error in the management of the vessel for which the owner was not liable, in that the carpenter forgot to replace the caps on certain sounding pipes before sailing, with the result that during very heavy weather, which was encountered on the voyage, water entered through such pipes.

In Admiralty. Suit by the American Sugar Refining Company against the steamship Carisbrook. Decree for respondent.

Carver, Wardner, Cavanagh & Walker, of Boston, Mass., for libelant.

Kirlin, Woolsey & Hickox, of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (John M. Woolsey, Charles R. Hickox, and Harry D. Thirkield, all of New York City, of counsel), for steamship Carisbrook and claimant.

HALE, District Judge. The libelant seeks to recover for damages to a cargo of sugar on a voyage from Preston, Cuba, to Boston, in June, 1913.

[1] The answer sets up that the bill of lading, issued for the goods on behalf of the United Fruit Company, the time charterer, contained, among others, exceptions for the act of God and perils of the seas. It alleges, as a further defense, that, on the voyage, the ship met with weather of extraordinary severity; that during this time sea water came in contact with some of the cargo, owing to the failure of the carpenter to screw the brass plugs in the sounding pipes of the ship; and that the damage sustained by the cargo was due to these causes, and was within the exceptions in the bill of lading; and that for the fault in management the steamship and her owners are exempt from liability under the Harter Act. The third section of the Harter Act provides:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence

to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel."

[2] Under this statute, in order for the shipowners to avail themselves of the exemption from liability for errors in management or navigation, the burden is on them to prove affirmatively that the vessel was seaworthy at the beginning of the voyage, or that due diligence had been used to make her so. The theory of the law is that, when the owner can show that he has discharged his duty of providing a ship that is in all respects seaworthy and properly manned, equipped, and supplied for the voyage, or that he has used due diligence to this end, he shall then be relieved from errors of navigation and management on the voyage. The Wildcroft, 201 U. S. 378, 388, 26 Sup. Ct. 467, 50 L. Ed. 794. The test of seaworthiness is held by the Supreme Court to be whether or not the vessel is reasonably fit to carry the cargo which she has undertaken to transport. The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 43 L. Ed. 241. On the question of seaworthiness, the second officer testifies that he inspected the holds of the ship before the cargo was loaded; that they were in perfect condition for receiving sugar; that the bilges were sounded before the cargo was taken in, and after the cargo was loaded, two hours before the vessel left the port. The chief engineer testifies that the holds were in good condition, and that the bilges were all cleaned out before taking in cargo.

The libelant sharply attacks the proof of seaworthiness, and urges that the testimony is superficial and insufficient to prove the fact of seaworthiness, or that due diligence had been exercised to make the ship seaworthy, and cites The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65; The Manitou (D. C.) 116 Fed. 60, and other cases. The libelant has offered nothing, however, to satisfactorily meet the evidence of seaworthiness. From all the evidence I must find that the claimant has shown affirmatively that he exercised due diligence to make the ship in all respects seaworthy and properly manned, equipped, and supplied, before she began her voyage.

The main contention arises on the question whether the cause of the damage was a fault in the management of the vessel within the meaning of the Harter Act. The boatswain and carpenter of the ship, Joseph Montesserin, testifies that, on the ship's arrival at Preston, he unscrewed and put away the brass caps from all the sounding pipes, with the exception of those in the tunnel, which were fastened by chain; and that he put in wooden plugs; and that he did this to prevent the sounding pipes being stolen; that, when the ship left Preston he replaced all these caps, except the two from the pipes leading to No. 2 bilge. He said the reason for this omission was that he had work to do, and forgot. Pierce, the second officer, testifies that it was the practice, when the steamer arrived in port, to take off the sounding pipes and put wooden plugs in the holes; that this was done to prevent the brass caps from being stolen; and that it was done at Preston in June, 1913, by the boatswain.

The testimony in behalf of the ship shows that she encountered rough seas on June 23, 1913; that the water flooded the decks fore and aft; that the next morning the carpenter sounded her bilges, and found that the wooden plugs had been washed out of the sounding pipes, and that water was breaking over the bridge deck. He screwed the brass plugs in place, took soundings at No. 2 bilge, found over four feet of water in that bilge, put a record on the blackboard in the engine room, for the engineer's information, that the pumps might be started pumping; but he said nothing to anybody as to the cause of the water being there. The second officer testifies that the ship was rolling and pitching during the bad weather, and that it was hard to obtain accurate soundings; that, on the morning of June 25th, the bilges in No. 2 hold were again dry. There is testimony that drainage from the sugar made a further pumping out of those bilges necessary on the next day.

The libelant contends, and offers evidence tending to show, that the damaged sugar did not, in fact, come out of No. 2 hold, but came out of No. 3 hold. The learned proctor for libelant urges that the whole testimony should lead the court to believe that it would be impossible for the amount of water which must have gone into the hold to have gotten there through the sounding pipes. He contends that only about 30,000 gallons could have gotten into the hold through these pipes, even though the pipes were continuously submerged to a depth of one foot. When we examine the testimony touching this point, it is found that one of the witnesses testifies that he had figured the diameter of the sounding pipes as something over half an inch. Later he said that he had figured it on a basis of an inch and a half to an inch and three-quarters. Another mathematical expert testifies on the basis of the sounding pipes being an inch in diameter, and figures that 30,000 gallons were taken into the hold. The whole testimony offered by the libelant is unsatisfactory on this point. Precisely what the diameter of the sounding pipes were is not made clear by the evidence, but that they were probably not over two inches nor less than an inch and a half. There is substantial evidence that water did get into the bidge and into the hold. Upon the whole testimony, I am satisfied that sufficient water ran through the sounding pipes to account for the damage for which the suit is brought.

The learned proctor for the libelant urges that great weight should be given to the apparent discrepancies of the soundings. It must be remembered that the ship was rolling, and the sea breaking over her, and that such conditions made it very difficult to obtain accuracy. It is not remarkable that the liquid in the hold remained stationary or even increased in quantity. Testimony in behalf of the ship has shown that the thick molasses water would run slowly through the limber holes.

Libelant seeks to show that the water in the hold might be due to an obstruction in the nonreturn valves. I think this is not sufficiently shown; but, even if it is, such obstruction in a nonreturn valve is held to constitute negligence on the part of the ship's employés, and to ex-

empt the ship from liability under the Harter Act. The Wildcroft, supra.

A sharp attack is made upon the testimony of Montesserin, the boatswain and carpenter. This witness is an uneducated man of a somewhat low order of intelligence. He has testified in a direct, straightforward manner (and I find no reason for believing that he has told anything but the substantial truth) that before sailing he had replaced all the caps, except the two on the sounding pipes leading into No. 2 hold; that, the next day, when he discovered that, through his negligence, water had reached the sugar, he was afraid of losing his job and of meeting further punishment; that he noted the fact on the engine room blackboard that No. 2 hold needed pumping; and that he said nothing to anybody about either his negligence or the result of it.

I think it unnecessary to refer in detail to further testimony. The case seems to me to present a very similar state of facts to those found in The Newport News (D. C.) 199 Fed. 968.

I am constrained to find that the owner of the Carisbrook exercised due diligence to make the ship in all respects seaworthy and properly manned, equipped, and supplied, when she began her voyage; and that the damage alleged in the libel was caused by error in management of the ship within the meaning of the statute, and that the ship and her owner are exempt from liability under the third section of the Harter Act.

It follows that the libel must be dismissed, but, under the circumstances, without costs.