THE PRESIDENT POLK. THE PRESIDENT ADAMS. ABE STEIN & CO. v. DOLLAR S. S. LINE et al.

District Court, E. D. New York.

Feb. 13, 1930.

See, also, 37 F.(2d) 102.

Single & Single, of New York City (Robert E. Hill, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Earl Appleman and L. de Grove Potter, both of New York City, of counsel), for respondents.

CAMPBELL, District Judge.

This is a suit in rem and in personam to recover for damages by fresh water to 80 bales of goat skins shipped at Shanghai for New York, in May, 1926.

The libel originally claimed damage to a shipment of 50 bales of Buffalo hides, but it is now restricted to 80 bales of goat skins.

The skins were properly stowed and dunnaged in the after part of a large compartment, about 100 feet long, in the lower hold of the steamship President Polk, reached by hatches Nos. 7 and 8, there being two 'tween decks above the lower hold.

In the forward part of this compartment were four fresh water tanks fitted on girders about twenty inches above the double bottom tank tops, situated about two feet from the bulkhead abreast of each other, about twelve to fourteen inches apart, running athwartships.

These tanks were used for carrying a portion of the vessel's fresh water supply, and the front of each one was fitted with two manholes eighteen to twenty inches in diameter, which manholes were equipped with plates made fast with gaskets, studs, and nuts, which when screwed up made them absolutely tight.

The water tanks in question were separated from the actual cargo compartments by a wooden partition, in which there was a sort of trapdoor for gaining entrance to the tanks.

The steamship President Polk was on her arrival at Shanghai properly manned, supplied, and equipped with a full crew of competent officers and men, and in all respects seaworthy.

While the work of loading was proceeding a gang of Chinese laborers was on board washing the inside of the fresh water tanks hereinbefore described, and giving them a clean coat of cement.

After their work was finished one of the manhole plates to the starboard wing tank was off and lay on the deck, and the other plate to that tank was simply fitted to the manhole, but had not been screwed up.

At Hongkong, the vessel's next port of call, according to custom the engineer ordered the tanks in question filled with fresh water, but neglected to put the plate on one manhole of the said tank, and also to tighten up the plate covering the other manhole of the starboard wing tank, and the fresh water from such tank wet some of the skins in

the said 80 bales and damaged them to some extent.

The escape of the water into the cargo was discovered, a survey of the damage was made, and twenty-four bales of the cargo were discharged, reconditioned, and forwarded at a later date on the steamship President Adams, which ships arrived in New York on July 15th, and were delivered on July 22d.

There was no additional damage to libelant's said cargo on the steamship President Adams.

The steamship President Polk arrived in New York on July 1st, and delivered to libelant on July 15th certain bales of skins, when it was found that four bales which had not been discharged were slightly damaged.

The libelant gave notice to the shipowner by letter dated July 2d that it would hold it responsible for damages.

The instant suit is by stipulation deemed to have been commenced on October 23, 1926.

The respondent and claimant contends that neither the vessel nor the respondent is liable, on the following grounds:

1. That notice of claim was not given as required by the bill of lading.

2. That the suit was not commenced within the time required by the bill of lading.

3. That the failure to replace the manhole cover or plates was an act of negligence in the management of the ship, which, under the Harter Act (46 USCA §§ 190–195), exempts respondent and claimant from all liability.

Clause 6 of the bill of lading provided as follows:

"6. * * * All claims of shipper or consignee or other party in interest against Carrier or its vessel or the masters thereof for any loss of or damage * * * of said merchandise or any thereof shall be presented in writing to the Carrier within ten days after discharge * * * and if any such claim be not presented within said ten days, such claim shall be and by every court be held to have been released by shipper and to be abandoned and barred; and no suit on any such claim so presented or to recover for any such loss or damage, shall be maintained unless summons or other process, be served on Carrier, or steamer be attached, within thirty days from and after the day and date that such claim be so presented; * * * and every such suit not so commenced within said thirty days * * * shall be and by every court be held to be barred, and all claims and demands against Carrier or Steamer alleged by complaint or libel therein shall be held to have been released by shipper, owner and consignee, and to be abandoned and barred."

The notice of claim was not given after any delivery, or, so far as the evidence shows, after any inspection of the cargo which came in on the steamship President Polk, but on the day after the arrival of the ship and before the libelant could say there was any damage to the cargo which came in on that ship.

Of course it is true that the libelant had received notice that water had come in contact with some of the cargo at Hongkong, and that a portion had been discharged there for reconditioning and forwarding on a later ship; but such notice of claim was given thirteen days before the arrival of the steamship President Adams, when it might have developed that there was no damage due to reconditioning.

The question here presented revolves itself around the purpose of requiring notice of claim, which seems to me to be to direct the attention of the steamship company to cargo as to which there are specific claims of damage, and not to the announcement in advance of receipt of the cargo to a general claim, when it has not yet been ascertained whether there is any damage to that particular cargo.

In other words, if the provision of that clause of the bill of lading is met by such a claim, then all that would be required would be for every shipper or consignee to give such a blanket notice before delivery, and the shipowner would not know what cargo was actually claimed to be damaged.

It is further to be noted that the bill of lading required that suit be brought within thirty days from and after the day and date that such claim is presented, and this clearly shows that the claim was to be presented after the damage was ascertained, and not, as in the case of both ships, before delivery of the cargo, and in the case of the steamship President Adams thirteen days before the ship even arrived at New York and while it was still on the high seas.

The notice of claim did not, in my opinion, comply with the requirements of the bill of lading.

That there was damage to the cargo which forms the basis of the instant suit is a fact, and, as it may be held that the notice was accepted and the requirement waived while

there was yet time for libelant to correct it, I will consider the other grounds on which the respondent and claimant contends it was freed from liability.

The instant suit was not commenced within the thirty-day period prescribed in the bill of lading.

■ I do not consider this question an open one in this district, as in a case involving a shipment from without the United States; a judge of this court has held as a matter of law that a thirty-day limitation in a bill of lading, on the time within which to bring such an action, is unreasonable and void. Andrew Gelderman v. Dollar Steamship Lines, Ltd., July 25, 1923, reported in summary, 41 F.(2d) 398, 1923 A. M. C. 983.

In the instant suit, if notice of claim had been given ten days after July 22d, the date of delivery of the cargo on the steamship President Adams, the last day provided in the bill of lading, it would have been August 1st, and thirty days from that time would have been August 31st, whereas the reports of the surveyors were not made until September 21st.

The remaining ground, however, requires careful attention.

The cargo in suit was loaded at Shanghai and, for the purpose of this suit, that was the commencement of the voyage. The Steel Navigator (C. C. A.) 23 F.(2d) 590.

The shipowner had not only used due diligence to make the vessel seaworthy, but she was in fact seaworthy when the loading of the cargo in question commenced.

The officers were licensed and competent men.

No question is raised about the vessel being seaworthy at the commencement of the voyage, except as to the plates for the manholes of the fresh water tanks, which were not replaced.

The tanks were not to be used at Shanghai, but, to make them fit for use for the storage of fresh water on the arrival at Hongkong, the next port of call, they were cleaned and a coat of cement applied, and the plate not securely fastened or left off to allow the inside of the tank to dry.

The inspection of the tanks and the putting on and securing of the plates is so clearly work in the engineer's department that I am convinced that the chief engineer knew the plates were off, or not tightened, and that they were left off under instructions, and that the chief engineer must have known that they must be replaced or tightened before he ordered the water run into these tanks at Hongkong.

Not only was it not necessary to place the plates on the tanks at Shanghai, but there were good reasons for not doing so, especially as to the tank which was last cleaned and cemented.

All the facilities to cover and make the manholes of the tank tight, when occasion required, were there; in fact, after the escape of the water at Hongkong, the plates were put on and tightened with the facilities there present, and the tanks remained tight for the balance of the voyage.

Section 3 of the Harter Act (46 USCA § 192) provides, in part, as follows:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel. * * * "

■ The failure to make the tanks tight when the necessity arose at Hongkong constituted an error in management, for which neither the vessel nor her owner or owners are liable under the Harter Act (46 USCA §§ 190–195). The Steel Navigator, supra; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; The Manitoba (D. C.) 104 F. 145; The Newport News (D. C.) 199 F. 968; The Carisbrook (D. C.) 247 F. 583.

The case of International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830, cited by libelant, does not seem to be in point, as there is a wide difference between an open port in the side of the ship and open manholes in the tanks in question, which were known to be open.

The libelant makes a point of the failure of the respondent and claimant to call the chief engineer, and contends that the presumption raised by such failure is that, if called, the testimony of the chief engineer would have been unfavorable to the respondent and claimant.

Accepting that as the law, the testimony of the witnesses who were called, and surrounding circumstances, are such as to convince me, in the face of such presumption, that the engineer knew of the condition of the tanks on leaving Shanghai, and that the

failure to close the tanks at Hongkong was an act of negligence on his part in the management of the ship.

A report in the form of a letter, written by the master of the vessel to the general agent of the owner at Hongkong, was offered in evidence to impeach the testimony given by the master, but it does not in terms deny the testimony given by the master, but does report that the chief engineer denied knowledge that the manholes were open.

The master positively swears, in answer to questions, that at Hongkong the chief engineer was instructed to put those manhole covers back, and properly secured, and to make them water tight.

In the letter he simply recites what the chief officer and chief engineer said, and does not make any statement about what he the master knew, or the orders given by him. I therefore attach much greater weight to his sworn testimony than to his unsworn letter, which does not deny any statement made under oath.

A decree may be entered in favor of the respondent and claimant, against the libelant, dismissing the libel, with costs.