THE WILLBABCO.

J. W. CROOK STORES v. OREGON S. S. CORPORATION.

BABCOCK ANGELL LUMBER CO., Inc., v. SAME.

BLOEDEL DONOVAN LUMBER MILLS v. SAME.

Nos. 11318, 11253, 11254.

District Court, E. D. New York.

June 22, 1931.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston and Ezra G. Benedict Fox, both of New York City, of counsel), for libelants.

Hunt, Hill & Betts, of New York City (George C. Sprague, Joseph A. McDonald, and Edna Rapallo, all of New York City, of counsel), for claimant.

BYERS, District Judge.

The libelant in the first cause is a Maryland corporation, owner of two lots of canned fruit shipped in good order and condition by California Packing Corporation of San Francisco ex Steamship Willbabco, covered by B/Ls 78 and 79, respectively. The ship sailed from San Francisco August 28, 1928, for Baltimore, Md., via the Panama Canal.

A portion of the merchandise was not delivered at all, and the balance was damaged and required reconditioning. The relevant portions of the bills of lading will be hereinafter quoted.

The claimant, Oregon Steamship Corporation, is the owner of the vessel, and pleads seaworthiness, and a storm at sea on September 18 and 19, 1928, as a result of which water found its way into hold No. 4, and thence into the shaft alley, causing, among other things, a break in a fuel oil pipe line; the water, and the oil thus released, damaged the property consigned to libelant; and that the water entered No. 4 hold through a port which is alleged to have been broken in the said storm.

In the second cause, the libelant is a Pennsylvania corporation, and shipped to itself ex Steamship Willbabco, on the same voyage, certain lots of lumber, laden at Everett, Wash., in good condition, for delivery at Newark, N. J., and covered by forty-four different bills of lading of uniform tenor. Certain of the lumber was not delivered, and certain of it was damaged and injured through contact with oil and water, etc.

The claimant pleads the facts referred to in the first cause, and also jettison rendered necessary, as it avers, by the conditions referred to, and particularly because the quantity of water taken into the ship caused her to settle by the stern so that the well deck aft was awash.

The jettison was of the deck cargo of lumber stowed aft, and is alleged to have been a general average act for the benefit of the entire venture, whereby it is said that the venture was saved and liability for the lumber so jettisoned is disclaimed. Also the damage is said to have been caused by a peril of the sea.

The third cause was presented by a Washington corporation which shipped certain lots of lumber on the Willbabco on the same voyage, to itself in part, and to another consignee in part; twenty-two bills of lading cover these shipments. The same default in delivery is alleged, and the answer of the claimant is substantially like that in the second cause.

The only provision in the bills of lading, quoted in the answers in each cause, is as follows: "The carrier shall not be liable for any loss or damage arising from any of the following causes, viz: * * * Heavy weather, the perils of the sea or other waters; * * * any latent defect in hull, boilers, engines, machinery or appurtenances, unseaworthiness of the ship even existing at the time of sailing on the voyage, provided the owners have exercised due diligence to make the vessel seaworthy."

There are few disputed questions of fact in the case, and the only one of moment is the exact draft of the vessel on her departure from San Francisco. Reference to that subject will be made presently.

The Willbabco is a three-well deck freighter, of about 470 feet length, with a beam of about 58 feet. She was built in Germany in about 1911, taken over by the United States during the war, and eventually came into the present ownership. Designed to carry both passengers and freight, she has fifty-two ports, twenty-six on each side, in the 'tween-decks, formerly the passenger quarters, now used entirely for cargo space. The ports are about 10½ inches in diameter; the glass is about one inch thick, and the space between the outside of the glass and the outer rim of the porthole is 2½ inches, so that the outer rim projects about ¼ inch from the side of the ship.

The backer plates were uniformly secured in place, that is, the nut on the lug was screwed home, because light in the 'tween-decks was not requisite. The sides of the ship were painted black, and the glass was painted over during the operation. The backer plates are bronze, of substantial construction; the lug and nut are of brass, and the jaws into which the lug rested were brass, all of substantial caliber. The pin holding the lug in place is of unknown material.

The problem presented by the evidence may be the more clearly revealed by relating the conclusion of the voyage, and then tracing its incidents in the inverse order of their occurrence.

The ship arrived in tow at Baltimore, September 23, 1928, having proceeded only in part under her own power, from the 20th of that month, from a position in the Atlantic off the Carolinas.

When at her pier, her starboard side being offshore, immediate inspection was made to determine the cause of the presence of considerable water in her No. 4 hold and 'tween-decks, and a less volume in her No. 3 hold and 'tween-decks. A leak was suspected, but no source thereof revealed.

An oil barge with pump was brought alongside to starboard on the following day, to pump oil from her shaft tunnel and adjacent parts, and in the afternoon discovery from the barge was made, that a starboard port opposite No. 5 hatch, about 80 feet from the stern, in the 'tween-decks of No. 4 hold, was broken; that is, the glass was missing, and the bronze backer plate was so dented inboard that it could not be screwed into place. The backer plate hung at an angle, that is, there was a space between it and the glass of 2 or 3 inches, so that a man's hand was inserted between the backer plate and the inner side of the port. A cargo batten, in place, prevented opening the backer plate further than 6 inches.

Closer inspection, made ten days or so later, revealed that the plate had been so bent that it could not be made to fit in its place in the closed position, by a margin of 1½ inches, and the lug could not be made to fit into the jaws designed to hold it, and the nut could not be screwed home—it was frozen—and the lug itself was bent.

The paint on the inside of the ship, beneath the port, contained rust stains, beginning at the lower rim of the port, about 6 inches wide and extending downward. These stains were made by water entering the port, and an expert offered the opinion that they were then about two weeks old.

A general inspection of the ship demonstrated that there was no other medium of entry of water into the hull of the ship, than this broken port, and the case has been presented, briefed, and will be disposed of upon that theory.

The ship had been in the tail of the Porto Rico hurricane of September, 1928, and, on the 19th of that month, the following occurred:

About 8 a. m., the chief engineer sent for the captain, who went to the engine room, and thence to the shaft alley, which was bulged in, and water was entering from the holds, on the starboard side; the holds were full of lumber, and it had swelled and caused the fractures through which the water was streaming. The water-tight door in the shaft alley, closing in the engine room, was shut, and braced (tommed).

The captain at once went on deck, and observed that the well deck aft was awash. No soundings could be taken aft; the ship was not making water forward.

The seas were rough, following from the southward, and the captain and other officers believed the ship to be in a sinking condition. Jettison of the after deck cargo of lumber was ordered, and proceeded from 9 o'clock in the morning until nearly midnight. This brought the ship's stern higher in the water, and, by the morning of the 20th, the seas had gone down, and fine weather ensued. On that morning, the captain sent his wife and children aboard the Guayquil, which was standing by. This was accomplished by lowering a boat from the Willbabeo; then the latter was taken in tow, and the voyage ended as has been stated.

On the 19th, the greatest force of wind was No. 7 on the Beaufort scale, and the seas were high, called mountainous in the log, and the ship was hove to, while the jettison was conducted. Around ten o'clock that night, soundings were taken, and showed 27 feet port and 28 feet starboard in the No. 4 hold, and in the No. 3 hold, 7 feet 9 inches port, and 19 inches starboard.

On the morning of the 20th, the soundings in No. 4 showed 20 feet port, and 18 feet starboard, and in No. 3, 9 feet port, and 15 inches starboard.

Arriving in Baltimore on the 23d, the soundings in No. 4 were 12 feet port, and 12½ feet starboard; in No. 3, 7 feet 5 inches port, and 3 inches starboard.

The foregoing is taken from the master's testimony as to the events of the 19th.

The chief engineer's version of the 18th is substantially as follows: He discovered a crack on the afterpeak bulkhead, about 6 inches long, extending from starboard to port. Nothing was coming through, as the afterpeak tank was empty. The bulkhead is in the tunnel recess at the end of the shaft alley, and the chief engineer himself caulked the crack.

That morning, the carpenter reported sounding the starboard bilge, No. 4 hatch, and finding 41 inches of water, so the pumps were started at once, and continued all day, but the water gained an inch or two by six o'clock at night. There was a heavy sea, and water was washing over the deck and would run down the soundings, so that it was hardly possible to get a correct reading. The pumps were continued during the night, beginning at 8 p. m., and continuing through the midnight watch.

The chief engineer's recital of conditions in the shaft alley on the morning of the 19th is more detailed than the master's, and is generally to the effect that the plates had bulged in at intervals to within 8 inches of the shaft, and, at the after end, the rivets had sheered off in places. At the bulkhead between holds Nos. 3 and 4, there were cracks, and there was about two feet of water in the shaft alley, for the length of the tunnel. The bulging in of the tunnel broke a valve in the filling line to No. 6 tank, and the rolling of the ship is said to have caused the oil to "slush out" of the tank, and into the shaft alley with the water.

Recurring to the weather conditions of the 18th, the wind seems to have increased in force from No. 4 on the scale to No. 7, and the following sea was from moderate to high; at 4 a. m., the wind was S. S. E., and the course of the ship was north, 6° west, so that the force of the following sea on the starboard quarter of the ship was exerted at an angle of about 16½ degrees, at the time of the discovery of 41 inches in the starboard bilge of No. 4 hold.

It is argued by the claimant that it was at this time that the port must have been stove in, although there is no direct evidence to sustain the conclusion. Having in mind that No. 4 hold and the 'tween-decks were filled with dry lumber laden in Puget Sound, it becomes necessary to reflect upon the probable length of time required by such a cargo to absorb enough water to produce sufficient swelling in the lumber to cause the breaking in of the shaft tunnel discovered on the morn.

ing of the 19th as related in the testimony of the chief engineer.

The ship had left Balboa, at the Pacific entrance to the canal, on September 12th, having been at the pier at that place overnight. Fuel oil and water were taken between arrival at 6:40 p. m. on September 11th and departure at 6 o'clock the next morning for Cristobal. The ship lay starboard side to the pier, fended off not less than three feet as testified by the master, and not more than ten as averred by the chief engineer. The floor of the pier is 16.5 feet above mean sea level, and, during the twelve hours that the vessel lay at the pier, the tide rose about 4 feet 4 inches.

The port in question was not more than 5 feet above water, and consequently a person of average height, who looked at the side of the ship near the port, would be viewing an object some 20 feet below the level of the eye; if the vessel were three feet from the side of the pier, he could not see the recess of the port at all; if ten feet separated the ship from the pier, only a small portion of the port would be visible; not enough to reveal the backer plate, if the glass were missing, and it may be doubted if the area of vision would include any part of the glass.

The importance of these conditions lies in the fact that an inspection of the ports in Balboa has not been established.

The inspection should have been made, first, because the ports, being in occupied cargo space, were not subject to daily observation from the interior of the ship, as in the case of ports in passenger quarters; and, secondly, because of the incidents presently to be referred to, on the trip down from San Francisco.

The ship's draft, on arrival at Balboa, is stated by the log to have been 27 feet 4 inches forward, and 30 feet aft. On leaving San Francisco, it was 27 feet forward, and 28 feet aft. The latter figures are from the testimony of the master, and the ship's log, and are deemed to have been established by the evidence, although an earnest effort has been made to demonstrate by another witness, not a member of the ship's company, that the draft on leaving San Francisco was 28 feet 10 inches forward, and 29 feet 6 inches aft.

Both of these sets of figures cannot be true, and no sufficient reason is suggested for discrediting the testimony of the master on this most important subject.

Based on the figures first quoted, it will be seen that the ship had gained in draft, while proceeding from San Francisco to Balboa, 4 inches forward and two feet aft. The master explains this by the filling of the fore and after peaks with water, to trim the ship, after the fuel oil contained had been consumed.

This is difficult to follow, because the tanks were filled with oil before San Francisco was left. Also he attributes it in part to seepage of rain-water into the lumber cargo on deck, which increased its weight. No figures or details are given to fortify this opinion.

Departure was had from San Francisco on August 29th, so that the Willbabco was thirteen days making the run to Balboa. During that interval, the following occurred:

On September 7th, 55 inches of water were sounded by the carpenter, in the bilge of No. 4 hold, starboard side; 12 inches on the port side. The pumps were started, and continued until they "sucked air."

This sounding is sought to be discredited, because said to have been made with a jointed sounding-rod, and not reliable because the well through which the sounding was taken was some 19 inches short in the bilge of No. 4 hold, thus permitting the rod to double back on itself in that space.

The carpenter was not called by the claimant, nor was his absence accounted for; the attempt to discredit his soundings, which are entered in the log, is not convincing. It is thought that even a landsman could tell when a jointed sounding-rod had touched bottom. Other soundings shown in the log indicated reasonable correspondence between the port and starboard bilges, which would be consistent with an intelligent use of the jointed sounding-rod by the carpenter.

On September 1st, two days after leaving San Francisco, the soundings showed 38 inches of water in the bilge of No. 4 hold, on the starboard side. The pumps took care of this, and the testimony is that the orders were, to work the pumps every watch.

It is thought that these soundings, which showed unusual conditions as to the depth of water on the starboard side of this hold, indicated the necessity for such an inspection of the ports on the starboard side of the vessel, at the No. 4 hold, as would eliminate them as a possible source of hazard. A consideration of the testimony yields the belief, that at Balboa there was nothing more than a casual glance cast in the general direction of the ports, as an incident to other occupation, or preoccupation—and this applies to all of the

witnesses who were questioned on the subject. The claimant has not proved actual inspection of the ports at Balboa, and the evidence shows that one should have been made.

Apparently, on sailing from San Francisco on August 29th, the soundings in bilge of No. 4 hold were 20 inches port and 38 inches starboard, and the master says that soundings throughout that portion of the voyage, namely, after leaving San Francisco, showed more water in No. 4 than elsewhere on the ship, and the only explanation is that the soundings were incorrect, although, as has been stated, they were entered in the log; after the pumps "sucked air" on one or more occasions, new soundings were taken with the straight rod, and, of course, revealed only a few inches of water in the bilge. Just why a deep sounding was never verified by trying the straight rod before the pumps started, on this leg of the voyage, is nowhere disclosed.

Arrival at San Francisco occurred on August 27th, and general cargo was taken into holds Nos. 1, 2, and 3, 'tween-decks; lower holds throughout being then filled with lumber laden in Puget Sound. The draft on arrival at San Francisco was 22 feet 3 inches forward, and 29 feet 10 inches aft. No lumber was taken in that port, and no cargo was laden through or near No. 5 hatch in No. 4 hold or 'tween-decks.

Recurring to the draft figures, it will be seen that, on leaving San Francisco, the forward draft was 4 feet 9 inches greater than on arrival, and aft it was one foot 10 inches less.

The attempt will not be made to explain these figures, as to the draft in the after part of the ship. The fact is stated merely as the testimony of the master appears in the record.

The prior port of call was Everett, Wash., where lumber was taken between August 16th and 23d; at this place the lumber cargo was completed, loading having commenced at Bellingham in the Puget Sound, where the vessel was so engaged from August 11th to 15th. Leaving Everett, in addition to the lumber in the lower holds, and in the No. 4 'tween-decks, there was about 1,200,000 feet of lumber, half forward and half aft, on the upper deck; on the after deck, it was mostly hemlock and nearly all rough.

The stow on deck was about 9½ feet high (thus the master; the second officer says 14 feet), and well lashed. The deck was covered, except for partial wells over some of the hatches, left for convenience in taking cargo

in San Francisco. Prior to receiving any lumber, about 500 tons of copper billets had been taken at Seattle, spread over the tank tops thinly, in holds Nos. 2 to 5, inclusive, so placed for stiffening the ship, in contemplation of the large cargo of lumber and the deck stowage of much of it.

Leaving Everett, the draft of the ship was 22 feet 9 inches forward, and 30 feet aft.

Much of the testimony had to do with the seaworthiness of the vessel, having in mind that she was laden as much as two feet below her indicated load line, as shown by figures placed on her stem and at the stern by her builders, but which figures had no legal significance at the time this voyage was undertaken. Interesting and carefully presented as this testimony is, repetition of it would not be presently justified. Suffice to state that it is convincing of the seaworthiness of the Willbabeo, so far as the stowage and extent of her cargo are concerned, for the voyage in question.

Sight has not been lost of the fact that loading the vessel about two feet below her original Plimsoll's mark had the effect of lowering the ports in the 'tween-decks from about seven to about five feet above the surface of the water, thus bringing flotsam in that much closer proximity; there is no evidence, however, that the port was penetrated by an object floating in the sea, and so the increased draft has not been shown to have been the cause of the damage.

There is much testimony offered to establish that the ports were observed at all places of call, between Bellingham, where the first lumber was taken, and Balboa, the last Pacific port on the voyage. The only careful inspection was made by second officer Maki, in charge of Nos. 3 and 4 holds and 'tween-decks, prior to and at the time of taking the lumber in Puget Sound. He says he examined the ports from the interior, and felt some of them to see if they were screwed tight, and at that time they were all in good condition. He examined particularly those that showed traces of dripping water.

Thereafter it is the testimony that, as the ship lay at dock in Bellingham, Everett, San Francisco, and Balboa, sometimes with her starboard alongside and other times with her port side to the pier, various officers looked at the ports, and observed them, and that they were all in good order and condition. Many of these witnesses point out that, if the glass had been wholly or partly missing at any of these places, the fact would have been quite apparent, because the outboard side of the

backer plate had assumed the conventional hue of oxidized bronze, gray or light green, and that, in the absence of the glass or part of it, that color would have been thrown into bold relief against the black sides of the ship. Such a deduction is plausible enough, but there is lacking the element of clear proof as to the respective levels of the eyes of these observers and that of the ship's ports, at the various piers where cargo was taken.

The testimony of these witnesses creates the impression that, in turning over the events of this voyage in retrospect, they have come to the belief that, if a port had been broken between the inspection at Bellingham made by Maki, and the departure from Balboa, surely some one would have noticed it; as no one did, it follows inevitably that no such thing occurred. Consequently, the testimony of the various observations could be safely and perhaps truly offered.

The danger of yielding to such persuasion is shown by the testimony of the master, touching an examination of the ports recorded in the log of September 20th, the day after the jettison, as follows: "Found the same O. K." The master and the chief officer, according to the former, leaned over the side and looked at the ports, and found them "apparently all right."

It may be conceded that no such examination of the ports could be made from the deck of the ship, as would disclose their true condition, which makes it quite clear that the entry in the log could not be justified. A technique which would admit of such an entry could scarcely be relied upon to establish the important fact of repeated observations or inspections of the ports, said to have been made at Everett and San Francisco. It has been previously stated that the alleged examination of the ports at Balboa is not deemed to have been shown, because of the physical conditions there existing.

That the importance of the condition of the ports was fully realized at the outset of the voyage, appears from the renewal of one of them in which the glass was found to have been broken, when the ship was in the Puget Sound. That repair was made by the carpenter, which indicates incidentally how pertinent his testimony might have been, if offered.

This somewhat extended review of the facts has been deemed necessary, in order that it may be understood that no evidence is to be found in the record which either places the time of the breaking of the port, or the circumstances attending it. The event

itself is the only explanation for the presence of over three feet of water in the bilge of No. 4 hold on September 18th, which was not reduced during that day, and twenty-seven feet on the following day.

The entry of the water into the lower hold was responsible for the swelling of the lumber, and the consequent breaking in of the shaft tunnel. But whether the lumber could have absorbed enough water between 4 o'clock in the morning of the 18th, when the 40-inch sounding was first taken, and 8 o'clock the following morning, when the conditions in the shaft alley were discovered, is not the subject of either direct or opinion evidence.

The witness Lunny, called as an expert as to the practice of loading vessels with lumber well below their assigned marks, was asked if an amount of water running over lumber for several days would lead to appreciable swelling, and he answered in the negative. If his opinion is sound, it would seem to follow that the lumber in No. 4 lower hold had been receiving water over, in, and around it for several days, prior to the effect produced upon the shaft alley heretofore noted.

If those who were present and in charge of the Willbabco on this voyage are unable to fix the approximate time of the breaking of the port, it is scarcely to be expected that those who were not present could achieve success at the task.

The weight of opinion from experts called by both proctors is that the damage to the port was the result of an exterior blow or force, and that the backer plate or dead light was in place and made fast, when the blow was delivered, and that view is accepted. Otherwise, the record establishes nothing concerning the cause of the happening itself.

A finding would not be justified under all the circumstances, that the damage was the result of a peril of the sea. No conditions of either wind or water reported in the log, or testified to by any of the ship's company, prior to the order for the jettison given at about 9 o'clock in the morning of September 19th, fall within the decisions on the subject.

Q. M. Duche & Sons v. T. & J. Brocklebank, Ltd. (The Makalla) 40 F.(2d) 418, 1930 A. M. C. 717 (C. C. A.) involved a huge wave which tore the coaming of the No. 1 starboard ventilator from the deck, ripped off the No. 2 ventilator, allowing the sea to pour into No. 2 hold where the damaged cargo was stored, and did considerable damage to railings, doors, and pipe casings. Such

was held to be a peril of the sea, within the B/L exception.

If any such happening is disclosed in this record, the court has failed to observe it.

The Newport News (D. C.) 199 F. 968, is also cited. In that case, the libel was dismissed without costs, because the cargo loss was due to error in management of the vessel. The bearing of the decision on this controversy is not apparent.

The Frey (C. C. A.) 106 F. 319. Persistent cross-seas of great violence, continuing apparently for many days, caused shifting in a well-stowed cargo, whereby certain of it was damaged by a part that was cast loose. Held, a peril of the sea was responsible for the damage, within the exception of the B/L.

Incidentally, reference is made to the burden of proof which rests upon the carrier, and to the issue, which is purely one of fact.

The claimant's brief quotes the material clauses of the bill of lading more fully than do the answers, and the exceptions include "sinking or other accident of navigation * * * jettison * * * seawater * * * nor for any loss or damage occasioned by causes beyond the carrier's control."

No authority is cited to sustain the position that the carrier can rest on a showing of jettison without more to demonstrate that such was the result of a cause beyond its control, such as a peril of the sea.

This decision will proceed upon the theory that this carrier was required to show, by the fair weight of evidence, that the jettison in question was rendered necessary because the ship was down by the stern, practically awash, due to the presence of sea water in No. 4 hold which entered through the broken port, and that the condition of the port was due to a peril of the sea. This requirement is believed to be in accord with Jahn v. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 365, 53 L. Ed. 546, 15 Ann. Cas. 748.

In that case, sea water damage to an underdeck cargo was not explained. In the course of its opinion, the Supreme Court says: "In other words, while there was a certainty from the proof of a damage by sea water, there was a failure of the proof to determine whether the presence of the sea water in the ship was occasioned by an accident of the sea, by negligence, or by any other cause. * * * As the burden of showing that the damage arose from one of the excepted causes was upon the carrier, and the evidence, although establishing the damage, left its efficient cause wholly unascertained, it follows that the doubt as to the cause of the entrance of the sea water must be resolved against the carrier."

The presence of sea water in the Willbabco caused the damage to some, and loss of other, of the cargo; the place of entrance of the sea water has been shown, but not the cause, namely, the reason why the port was broken, thus affording the means of access of sea water to the interior of the ship.

It is concluded, therefore, that the libelants in these respective causes may take the usual decree, with costs.

If the foregoing be deemed an insufficient compliance with Admiralty Rule 46½, findings and conclusions may be settled on notice.