### ROOKS v. ELLIOTT & WATROUS, Inc.
### No. 1739.

District Court, D. Rhode Island.
March 22, 1946.

Edward Winsor (of Edwards & Angell), all of Providence, R. I., for libelant.

John L. Curran, of Providence, R. I., for respondent.

HARTIGAN, District Judge.

This is a libel in admiralty brought by Benjamin D. Rooks of Barrington, Rhode Island, against Elliott & Watrous, Incorporated, a Connecticut corporation, doing business in East Providence, Rhode Island, to recover damages for the loss of a cargo of oyster shells valued at $1,206.

The libelant is a grower and dealer in oysters and as incidental to said business accumulates, sells and uses for planting seed beds large quantities of oyster shells.

The respondent is a corporation doing business as marine contractors and maintains a fleet of tugs, barges and scows for the transportation of freight.

On July 5, 1944, the libelant and respondent entered into a written contract for the transportation of oyster shells belonging to the libelant from Warren, R. I., to planting grounds near New Haven, Connecticut. (Ex. A.)

On July 7, 1944, the respondent provided a scow owned by it and the tug Miranda for the transportation of a load of oyster shells pursuant to said contract.

The tug and scow left the libelant's dock at or about 8 o'clock in the morning of July 7th for waters in the vicinity of New Haven, Connecticut, and proceeded around the northerly end of Patience and Prudence Islands in the general vicinity between Sandy Point Light and Prudence Island at which point the scow and its cargo of 12,060 bushels of oyster shells sank in over 100 feet of water at about 11:30 a. m. and the shells were completely lost.

The weather was clear and the wind was southerly and blowing at the rate from five to seven miles an hour.

The respondent alleges in its answer that at the time the scow sank "A fleet of naval vessels known as 'P.T.boats', so called, came in close proximity to said scow and at a great rate of speed and thereby caused a great swell or surge of the seas to sweep over said scow and cause said scow to take water and putting one of the pumps of said scow out of commission, the amount of water then taken caused the stern of said scow to be depressed below the surface of the sea and then the sea rushed into the hold of said scow; that the respondent, its agents and servants, did all that was possible to be done to save said scow and said cargo."

The respondent also alleges that the "said scow was engaged in transporting merchandise from a port of the United States of America and that her owners prior to the commencement of her voyage had exercised due diligence to make her seaworthy, and properly manned, equipped and supplied and that under the terms and conditions of the Act of Congress approved February 13, 1893 entitled 'An Act relating to the navigation of vessels,' etc. (known as the Harter Act, 27 Stat. 445, 46 U.S.C.A. § 190 et seq.) the ship and her owners are not responsible for any loss or damage that may have been incurred by reason of the matters alleged in the libel."

The scow was of the hollow box design. It was also described as a "deck scow", 112 feet long, about 30 feet wide, 8 feet deep, with a flush deck that had 3 or 4 inches of coaming. It was equipped with two 4 inch gasoline pumps with 20,000 gallons capacity located fore and aft on the deck, and also two hatchways through which one could go into the hold. There were covers for the hatchways and heavy canvas for battening them down.

The scow had previously carried piles, heavy timber, coal and gravel. It had a crew consisting of a captain and a seaman, both of whom had several years experience.

The captain testified that he and the seaman were riding on the stern of the scow prior to the sinking; that the sides of the scow were a good three feet out of the water as it went along; and that "we

were just towing along and there were several torpedo boats passed us and going off to sea—I don't recall how many but quite a number of them—and wet one of the pumps and quite a lot of water went in the hold and we tried to get the back pump going. It wet the mag of the pump." When asked about the bow pump, he testified, "We tried to get to that but we got her going but we couldn't hold her with one pump."

He admitted that in that territory he had frequently seen "P.T. boats" on previous trips and that the "P.T. boats" frequently went close to him. On the day in question six or seven of them went by in single file, "off two, three hundred feet" at a rate of speed of about 45 or 50 miles an hour. He testified the sea surged up several times and swept the scow from bow to stern.

He testified that the first wave put the stern pump out of commission; that he went to the forward pump and got it started; that the scow settled down by the stern and that it was under water at about the fourth surge of the sea.

He testified that two pumps were sufficient pumping equipment for the scow and that he did not see a seam open up in the scow.

He admitted that both hatchways were not shut as the "P.T. boats" came along; that they were kept open in order to go down and check the suctions and go through the hold once in a while; that they were kept open "until we get down where we are going outside. Then we seal them."

He testified that the scow sank about fifteen minutes after the "P.T. boats" went by.

When asked: "Now after these boats went by, will you describe what happened and what steps you took right up to the time that the scow sank?" he answered, "Well, as I say, the boat went by and just caused us heavy seas and whatever happened, we don't know, but I couldn't get the stern pump going, as I said. We tried to get the front one and it was too late. And the scow started to make water very fast."

He testified that as the scow began to sink he beckoned to the tug to come back; that it did and as it got alongside, the scow was pretty near under, and that he and the seaman were taken aboard the tug.

He denied that he saw the sides of the scow spread as it went under. He said he didn't think he told a Mr. Flannery on July 14, 1944, the giving away of the deck caused the sinking, but admitted signing his name to a paper to that effect. He claimed that the statement to Flannery in that regard was what the seaman had said.

The statement (Ex. 3) which the captain signed July 14, 1944, read in part:

"When I pulled away from Rooks' dock the scow was in a good condition. When about 3 hours from Rooks and near Sandy Point Light I noticed that a top deck, about 18 inches above regular deck, had given way.

"This is what I believe caused the sinking. The pump was not able to keep up to the water coming into the scow. I worked them faster but to no avail.

"I called to Capt. Maurice Burns, in charge of the tug 'Miranda', also owned by Elliott & Watrous, and he piloted the tug alongside. He took the hauser rope from the scow when he saw nothing could be done to save the scow. Shortly before the scow sank, one side started to spread. She sank at about 11:30 A. M."

He was interrogated as follows:

"107 Q. I want you first to read that over to refresh your recollection and have in mind just what you said or just what you signed your name to one week after the events which we are discussing here. A. That false deck was an error.

"108 Q. In other words, the portion of this statement that said: 'I noticed that a top deck, about 18 inches above regular deck, had given way.' You say the existence of such a deck is an error? A. Yes, there was no 18 inches of the top deck.

"109 Q. How many inches were there? A. There were none.

"110 Q. And did a portion of the deck give way? A. I couldn't see it had, but one of the fellows with me said: 'It looks as if it was.'"

The captain had little knowledge of reading. He testified he did not read the statement before he signed it and the person who took it was not called as a witness to refute this.

There was no testimony that warrants me to believe that the scow had a top deck about 18 inches above the regular deck.

The libelant contends that the sinking resulted from the unseaworthiness of the scow and from defects in loading.

The contract provides in part:

"It is agreed and understood that the B. J. Rooks & Son will load all shells on the scows; scows to be furnished by the Elliott & Watrous Company for transporting of same.

"It is agreed that Elliott & Watrous, Inc., shall unload all shells at their destination."

The testimony discloses that the scow was loaded by means of a conveyor operated by the libelant who had its men on the scow to regulate it and that the captain of the scow had charge of the loading.

The testimony is convincing that nothing unusual happened until the "P.T. boats" went by.

Title 46 U.S.C.A. § 192 provides: "Limitation of liability for errors of navigation, dangers of the sea and acts of God. If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The testimony leads me to find that the owner of the scow exercised due diligence to make it seaworthy and that it was properly manned, equipped and supplied when it commenced its voyage.

In The Irrawaddy, 171 U.S. 187, 191, 18 S.Ct. 831, 832, 43 L.Ed. 130, the court said: " '* * * Where due diligence has been exercised to make the ship seaworthy, and a common danger arises upon the voyage by "fault or error in the navigation or management of the ship," the third section of that act (Harter Act) declares that "neither the vessel nor her owner, agent or charterer shall become or be held responsible for damage or loss resulting therefrom." The previous liability of the ship owner to the cargo owner for faults of navigation is thus abolished in all cases coming within the act. In such cases faults in the navigation or management of the ship are no longer, by construction of law, faults of the owner, as heretofore; and the ship and her owner are now no more liable to the cargo owner for his damages therefrom than the latter is liable to the ship owner for the resulting damages to the ship. * * *' "

Among the cases cited by the libelant in support of its claim is Atlas Portland Cement Co. v. P. Dougherty Co., 2 Cir., 205 F. 508. The facts in that case are so different from those in the instant case that it does not seem to me to be in point.

The scow had carried heavier cargoes on previous trips in the same area.

In The President Polk, D.C., 40 F.2d 665, 667, the court said: "The failure to make the tanks tight when the necessity arose at Hongkong constituted an error in management, for which neither the vessel nor her owner or owners are liable under the Harter Act (46 U.S.C.A. §§ 190-195). The Steel Navigator, [2 Cir., 23 F. 2d 590]; The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; The Manitoba, D.C., 104 F. 145; The Newport News, D.C., 199 F. 968; The Carisbrook, D.C., 247 F. 583."

The failure of the captain of the scow to close the hatches when he saw the "P.T. boats" constituted, at most, an error in management.

It is my opinion that the application of Section 3 of the "Harter Act" to the facts proved here relieves the respondent from liability.

Judgment may be entered in favor of the respondent against the libelant, dismissing the libel, with costs.