## THE EARNWOOD.

### FRANKLIN SUGAR-REFINING CO. v. THE EARNWOOD.

(District Court, E. D. Pennsylvania. July 2, 1897.)

1. SHIPPING—DAMAGE TO CARGO—INSUFFICIENT DUNNAGE.
   A ship which neglects to provide dunnage for sugar cargo, in consequence of which the bags in the lower tier are allowed to rest on the floor, in the moisture caused by drainage from above, is liable for the damage, including both natural drainage and such as arises from soaking by sea water.

2. SAME—ASCERTAINMENT OF DAMAGES—SALE OF GOODS.
   The value of goods damaged through neglect of the ship is best determined by a public sale thereof within a reasonable time after arrival. Where a cargo of sugar was delivered on March 12th, and the damaged portion was sold on April 3d, held, that the sale was within a reasonable time, and that intermediate fluctuations of the market for sound sugar were not to be regarded.

In Admiralty.

This was a proceeding in admiralty by the Franklin Sugar-Refining Company against the steamship Earnwood, in which the following state of facts appeared: On or about the 27th day of January, 1894, Francke Hijos & Co., the vendors of libelant, entered into charter party with the Earn-Line Steamship Company, time charterers of the said steamship Earnwood, for the transportation of a cargo of sugar from a port in Cuba to Philadelphia, at the rate of freight therein mentioned. Bills of lading were signed and delivered by the master for 20,523 bags, shipped in apparent good order and well conditioned. The cargo of sugar after being shipped from Cuba was duly purchased by libelant, who became the owner thereof, and to whom the said cargo was to be delivered at the port of Philadelphia. The steamship sailed from the ports of Cardenas and Matanzas in Cuba, where she had taken on board the said cargo, and subsequently arrived at the port of Philadelphia, on the 7th day of March, 1894, and was unloaded of her cargo on the 12th day of March. Of the said cargo of sugar, it was then claimed by the libelant that 821 bags were greatly stained and damaged, owing to the neglect on the part of the ship to provide proper dunnage under the cargo in the hold, and between the decks. Appraisement and surveys were made by the direction of both the libelant and respondent, separately, which differed both as to the condition of the cargo and the stowage of the same. The bags which the libelant claimed were damaged, were placed by the libelant in the hands of a competent auctioneer, who after due notice, by advertising, sold the same at public sale, on April 3d following, by which time the market price of sugar had fallen. This proceeding was then begun by the libelant to recover damages which had, it was alleged, accrued to it by the sale of the damaged sugar, the libelant having paid the respondent in the meantime the latter's freight, reserving the right to bring the present action. After proofs were taken by each party, the case was argued upon its merits before BUTLER, J., who subsequently delivered the following opinion:

"The water tanks had covers, and an open space existed between them and the floor of the hold. The sides of the vessel were battened so as to prevent cargo from resting directly against them. The only ground of complaint is that the vessel was not provided with dunnage under the cargo in the hold, and the between-decks. No such dunnage was provided; and the failure to provide it is just cause for complaint. The drainage from the sugar pressed down to the floors and injured so much of the sugar as was contained in the lower tier of bags. That such drainage is usual and unavoidable, the evidence does not leave in doubt. Even with proper storage, the sugar will be more or less affected by sweating, and for the loss thus sustained there is, of course, no liability; but with the lower tier of bags placed immediately on the floor, precluding the circulation of air, and subjected to the drainage from above, this cargo was rendered liable to injury which should have been avoided. The use of such dunnage is customary, and it should have been employed in this instance. The case differs in some circumstances from Robinson v. Refining Co., 70 Fed. 792, but in principle is similar. For the loss resulting from the failure to use it in this instance, the respondent is liable. The suit must therefore be sustained, and a commission be appointed to ascertain the extent of this loss."

Accordingly, the case was referred to Francis C. Adler, Esq., as commissioner, who after hearing testimony, in pursuance of his appointment, reported that 821 bags of sugar, as claimed by the libelant, which had been stowed on the lower tier in the hold, had been damaged by neglect on the part of the ship to provide proper dunnage. The damage to the sugar, the commissioner found, was brought about by the presence of sea water, which could have been avoided had proper care been exercised. The commissioner reported that from March 12th, to March 19th, the damaged bags of sugar were held by the libelant at the special order of the respondent. He further found that the best method of ascertaining the value of the damaged sugar was by a public sale of the same within a reasonable time after the arrival and delivery of the goods, and that the sale which had been made of them, on April 3d, was in every particular properly conducted, and was within a reasonable time after the arrival. Upon the question of what damages, if any, libelant was entitled to recover, the commissioner reported that the market value of sound sugar which upon the day of delivery, March 12th, was $3^3/_{16}$ cents per pound, had fallen to $2\frac{7}{8}$ cents per pound on the day of the sale, and that on the latter day, the damaged bags

were sold for 2½ cents per pound. He also found that 324 pounds of sugar had been lost by rehandling. In his opinion, the proper measure of damages for the injury to the sugar was the difference between the market value of sound sugar on the day of delivery, and the market value of damaged sugar on the day of the sale, together with an allowance for the 324 pounds lost by rehandling, for wharfage, and for auctioneer's expenses. This sum the commissioner ascertained to be $2,131.81. The commissioner, however, reported that inasmuch as his authority was confined strictly to the ascertainment of the damage done to the lower tier of bags by the drainage from above, or from want of circulation of air, due to the lack of dunnage, he was compelled to report that the libelant's evidence fell short of that, because in his opinion the damage was due to the presence of salt water. He therefore reported that the libelant was not entitled to a recovery, unless the court be of a different view than that expressed in its opinion (supra); if the court, however, was of opinion that the libelant was entitled to recover under the circumstances, he reported that it was entitled to recover the sum of $2,131.81.

Exceptions were filed to the commissioner's report by both parties.

### J. Rodman Paul, for libelant.

I. The ordinary rule for the measure of damage in cases of goods injured in transit is the difference between the sound and damaged goods, in value, at the time and place of arrival. Hale, Dam. p. 254; Suth. Dam. § 933; Sedg. Dam. (1891) § 845 et seq.; The Mangalore, 23 Fed. 463: Manufacturing Co. v. The Guiding Star, 37 Fed. 641. This is admitted to be the general rule. Where, however, the relation of vendor and vendee exists between shipper and consignee, the contract price of the sound goods forms the basis of value, rather than the market price. In the present case the contract price and the market price on the day of arrival coincided, so that this element need not be considered here.

II. But how is the value of the damaged article to be determined? There are only two methods: First, the views and opinions of experts, which, as is well known, are apt to differ widely, and, in the final result, to inflict hardship upon the carrier, since there are always to be found those who would not wish the damaged article at any price. As Judge Morris said in the case of Hamilton v. The Kate Irving, 5 Fed. 634: "It may be that damaged goods of the particular kind are not often dealt in. It is often difficult to find merchants who will buy unmerchantable goods at any price, although to the consumer they may be as serviceable as before they were damaged. In this case one of the principal iron merchants called as a witness said he would not have taken the damaged cotton ties at any price." And yet, on a sale, these ties brought not far below their sound value. But the uncertainty and the unsatisfactory character of expert testimony is sufficiently well known, and it is unfair that either party should be subjected to it, especially the innocent receiver of the goods, who should be left in no doubt as to his proper course in order to liquidate or determine the exact amount of damage. The only other, and the universally preferred, method of ascertaining the value of damaged articles, is a public sale, after due advertisement, and opportunity for bidders to be present. In Henderson v. The Maid of Orleans, 12 La. Ann. 352, the court said, after stating the general rule for the measure of damage: "That difference in value should have been ascertained by a public sale to the highest bidder. Greenwood v. Cooper, 10 La. Ann. 796. It was in the power of plaintiffs to have subjected them to this test, as the clocks have always remained in their possession in the warehouse. It was their duty to have done so." In the case of The Ship Thirlmere, No. 35 of 1894, in this district (unreported), the precise point was fully discussed by the learned commissioner, Mr. Morton P. Henry, and his report was confirmed by the court. There a cargo of chalk arrived, somewhat damaged by manganese dust. The consignee refused to accept it, although it had been delivered at his yard; merely notifying the shipowner that it was held subject to his order, and requesting him to remove it. On the assessment of damages before the commissioner, the chalk was still in the possession of the libelant, and he attempted to prove the extent of the damage by the opinions of various experts who had examined the chalk. The commissioner ruled that a sale was the only proper and satisfactory way of ascertain-

ing the character and extent of the damage. The commissioner further held that a month was a reasonable time within which the sale should have taken place, and allowance was made for storage, expenses, etc., only up to the period of one month after the arrival of the damaged chalk. The commissioner here has found as a fact, and it is not seriously disputed, that, for the purpose of securing a proper public sale, the time intervening between the arrival of the Earnwood and the date of sale (between two and three weeks) was not unreasonable, in view of the necessity of advertisement, the delay occasioned by the attachment for freight, etc. Indeed, precipitous and hasty sales have been properly condemned by the courts. In The Marinin S., 28 Fed. 664, a cargo of licorice was damaged to some extent by iron-ore dust, which might have been prevented by sufficient dunnage. The whole lot of licorice was at once sold at auction, after survey, without attempting to separate the bundles that were sound from those that were injured. "To throw a large quantity of goods," said Judge Brown, "on the market, for sale at auction as damaged goods, upon such slight examination, at the assumed risk and loss of the vessel, appears to me to be as unreasonable and unjust as it would be ruinous in its results to carriers. Looking to the just protection of the interests of carrying vessels, as well as of consignees, a court of admiralty cannot support any such unreasonable and precipitate action. The good bundles should have been separated from the bad, and the carrier charged with only the damages to those actually injured, together with the expense of the examination and separation, when that course is practicable, and for the evident interest of all concerned. The master is entitled to the same protection against unreasonable and indiscriminate sales by the consignee in the port of discharge on the vessel's account and risk, that is imposed on the master, in favor of the owner, on a sale by the master in a foreign port." The sale, therefore, must be deliberate, with a careful regard for the rights of all concerned. This requires time, and the time in the present case was not excessive.

III. A public sale being not only the best, but perhaps the proper, method of determining the value of damaged goods, and such sale, in order to be fair, requiring the lapse of a certain time after arrival of the goods, the intermediate fluctuations of the market are not to be regarded in liquidating the value of the damaged goods as of the date of arrival. Any other rule would put upon the innocent receiver of goods the risk of the market, and compel him to abandon the best and fairest method of ascertaining the damage, and rely upon the opinions of experts, thus introducing into the commercial world an unfortunate element of doubt as to the course of action to be pursued in each case. The authorities sustain the position that intermediate fluctuation of the market for sound goods between arrival and sale of damaged goods should not be regarded in determining the value of the latter, as of the prior date of arrival. In Collard v. Railway Co., 7 Hurl. & N. 77, the carrier was held liable for damage to certain hops consigned to a purchaser, and rejected by him. The shipper, to whom they were returned, dried the same hops, which were rendered as good as ever for actual use, but their market value was depreciated. A sale of the hops was then had, but at that time the market price of hops had considerably fallen from what it was at the time when they should have been delivered to the consignee. It was held by the court of exchequer that the plaintiff "was entitled to recover as damages the difference between the market price on the day when the hops were sold, and the day when they ought to have been delivered." Said Baron Channell: "It must be ascertained what they were worth at the time they became available to the plaintiff as marketable goods, contrasted with what they would have been worth if the defendants had performed their contract. I do not know what other test can be applied for ascertaining the damage." It will be observed that in deciding this case the court did not consider how far more speedy action on the part of the plaintiff might have brought the damaged hops into the market when higher prices were ruling for sound hops. The sale was merely the reasonable method of liquidating and ascertaining the real value of the damaged hops, irrespective of intermediate changes of the market. A case very much in point was decided by Judge Wales in 1888. In Morrison v. Steamship Co., 36 Fed. 569, the syllabus reads as follows: "A cargo of prunes, which should have been delivered not later than April 28th, was, by the negligence of respondent, not delivered

until June 11th, and then in a damaged condition. They were sold on July 8th, on which day the market price for sound prunes was 6 cents per pound, but on account of their damaged condition a portion of the prunes brought only 5½ cents. The market price on April 28th, when they should have been delivered, was 5 cents. Held, that libelant was entitled to recover the difference between the market price on the day of delayed delivery and the price for which the damaged prunes sold. Respondent cannot be allowed to escape liability by reason of the advance in price in the interval between the dates of required and actual delivery. Respondent has no cause to complain of the delay in making sale of the damaged prunes. It was the libelant's duty to prevent a sacrifice, and to obtain the best market price, and it does not appear that an unreasonable length of time was taken to do this." It will be observed that the sale in this case of the damaged prunes took place nearly a month after arrival, and the price of prunes had considerably advanced. It might equally well have been assumed there, as here, that the price of the damaged prunes would have been less on the day of arrival than on the day of sale, supposing the ratio of values between sound and damaged fruit to be always the same, yet the court did not so estimate the value of the damaged fruit, but took the actual proceeds of sale as the only test, and awarded the libelant "the difference between the market price of sound prunes on June 11th, the day of delayed delivery (5¾ cents), and the price for which the damaged prunes sold on the 8th of July (5¼ cents)." See page 571. On the question of the time elapsing before the sale, Judge Wales said: "Nor have the respondents any just cause to complain of the postponement of the sale of the damaged prunes. The interval of time that elapsed between the day of delivery and the day of sale was not long. It was the duty of the libelant to prevent a sacrifice of his property, and to obtain the best market price, and this course was equally advantageous to the respondents; for, if the damaged prunes had been sold immediately on their arrival, it is quite probable that they would have sold for less than they did. There is no evidence that they might have brought more. Moreover, it is questionable whether the libelant would have been justified in making an immediate sale, and without an endeavor to secure the highest attainable price." Citing The Marinin S., supra. Now, in this case, neither the libelant, on the one hand, nor the respondent, on the other, was allowed to profit by the incidental rise in prices. The libelant was not permitted to compute the value of the damaged prunes as of the day of arrival by relation to the lower value of sound prunes on that day; nor was the respondent permitted to urge the increased market value of sound prunes as a recoupment to the libelant for his loss. The present case is the exact converse of the foregoing, and is ruled by it. The Earnwood should no more profit by the accidental fall in the price of sound sugar than the libelant was permitted to profit by the accidental rise in prices in the prune case. Any other rule is based upon the assumption that there is a constant ratio between the values of sound and damaged articles having a market rating. This is a fallacy. Peculiar circumstances, quite outside of those influencing the general market, affect the prices of damaged goods. A thousand matters outside of the ordinary rules of trade will vary the prices of damaged articles at different dates. Opinions differ as the poles in regard to the value of damaged goods. A thousand matters will make the price of one day no test for the price of another. The only reasonable method is to determine the value of damaged goods on the day of arrival by their selling value at auction within a reasonable time thereafter, irrespective of the fluctuations of the market. In the present case it is submitted that there should be no distinction as to the measure of damage between the case of the consignee, who manufactures (as here), and the consignee, who sells. In the latter case the hardship of affecting the importer with all changes of the market occurring between the day of arrival and the day of sale is very apparent. He sells the sound sugar on the day of its arrival, at its then market price. He would have sold the damaged sugar for the same price if the negligence of the carrier had not injured it. To be indemnified, he is entitled to precisely the difference between the value of the sound on the day of arrival, and the proceeds of a public sale of the damaged. Whether the market for sound sugar rises or falls prior to the sale is of no consequence. If it rises, the damaged sugar may or may not realize a higher price; but, if it does, the

damages payable by the ship are less. If the market falls, and the price of damaged is thereby affected, then, as a matter of fact, the ship has to pay more. But surely the risk of such fluctuation should be placed upon the wrongdoer who has rendered a sale necessary, rather than the receiver of the goods, who can only be indemnified by receiving the difference between what the sound sugar would have realized on the day of arrival and what the damaged sugar actually realized on the date of the auction sale. By keeping clearly before us the position of the consignee for sale, the matter is plain enough,—difference between what the damaged sugar would have sold for if sound and what it did sell for as damaged. Fluctuations of the market meanwhile having nothing to do with it, since, if the market value of sound on the day of auction sale is to be taken as the basis, we have not the value of sound on date of arrival as one of the factors in accordance with the rule, but the difference between sound and unsound at some subsequent date, viz. the date of the auction sale. It would be injurious to the commercial community if the receiver of cargo damaged in transit must either sell instantly, without proper care or deliberation, or must take the risk of fluctuations in the market if he waits a reasonable time. It would be equally unfortunate to assume as a measure of damage a supposed constant ratio between the market value of a sound article and the auction value of a damaged one.

Henry R. Edmunds, for respondent.

BUTLER, District Judge.    The commissioner has construed the language of the court too narrowly.    The terms "drainage from the sugar," used in the opinion, did not contemplate drainage from sweating only, but such as might arise from any cause, including of course the soakings from sea water.    The liability of the respondent, as the opinion states, arises from the neglect to provide dunnage, in consequence of which the lower tier of bags rested on the floor, in the moisture from above, with no opportunity for drying, such as proper dunnage would have afforded.    It is clearly unimportant therefore from what source the moisture came.    The commissioner has found that 821 bags were damaged from neglect to provide such dunnage; and that the loss therefrom is $2,131.81 with interest from April 3, 1894.    A decree will therefore be entered for $2,547.51—which the court finds to be the amount of loss.

The exceptions filed by the respondent are dismissed.    They are fully considered in the report; and I am satisfied with the conclusions there stated.    The point made that account should be taken of the change in market value of sound sugar between the date of arrival and of the subsequent sale, in ascertaining loss, is interesting, and if new would present difficulty.    It has, however, been involved in numerous cases; and in no instance has it been decided as the respondent contends it should be; nor does any elementary authority so qualify the general rule governing the subject.    I do not deem it necessary to add to what the commissioner has said; but as the point is well considered, and the authorities cited in the libelant's brief, I will annex it hereto.

It is worth while to note that the question is not very important here, in view of the commissioner's finding that nearly all the fall in sugar occurred while this sugar was held under the respondent's special order.    It would certainly be unjust to put the consequences of this fall on the libelant.