71 F.2d 752 (1934)
THE INDIEN.
ORIENT S. S. CO.
v.
MITSUBISHI SHOJI KAISHA, Limited.
No. 7359.
Circuit Court of Appeals, Ninth Circuit.
June 15, 1934.
*753 Ira S. Lillick, John C. McHose, J. Arthur Olson, H. R. Kelly, and Young, Lillick, Olson, Graham & Kelly, all of Los Angeles, Cal., for appellant.
Alfred T. Cluff and Sawyer & Cluff, all of Los Angeles, Cal., and Hill & Rivkins, of New York City, for appellee.
Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.
SAWTELLE, Circuit Judge.
Based principally upon the alleged error of the court below in finding that the appellant's motorship was unseaworthy and that due diligence had not been exercised in that regard, this is an appeal in an admiralty cargo damage suit from an interlocutory decree in favor of the libelant appellee.
The appellee was the purchaser and consignee of a shipment of ammophos fertilizer, part of which was damaged by sea water while on board the appellant's motorship Indien in transportation from New York to Japan.
There was no trial or oral argument in the lower court. The entire case was submitted on the pleadings, briefs, and depositions, consisting of the testimony of ten fact witnesses and six expert witnesses for the appellant and four expert witnesses for the appellee. Because of this fact, we are here called upon to consider the case de novo.
During a severe storm in the North Pacific Ocean, while the Indien's decks were repeatedly swept by large waves, a brass screw cap came out of the top of a bilge sounding pipe on the after deck. Sea water ran down the pipe, overflowing the bilge and wetting a number of sacks of ammophos in No. 3 lower hold. The damage was caused when the sea water came into contact with the soluble ammophos.
The libel also alleges damage to some ammophos in No. 4 hold. During the storm, an oil tank sounding pipe, running into this hold, broke at the junction with the tank top. It was alleged that some oil splashed out of the tank and upon the fertilizer bags. *754 Since the rendition of the interlocutory decree, however, counsel for the appellee have declared that no damage was done by the oil and that no further claim will be made in that regard. The lower court found that there was not sufficient inspection of the oil tank sounding pipe, and that therefore due diligence had not been exercised in connection therewith. In its brief before this court, the appellee argues the point slightly, presumably because of its bearing on the general and ultimate question of the Indien's seaworthiness. In our view of the case, however, it is unnecessary to consider this allegation.
We are therefore concerned only with the damage in No. 3 hold, and with the question of whether the motorship should be held liable for that damage.
The Indien is a modern steel motorship of 5,702 gross tons, 390 feet in length and 53 feet in beam, and classified as "+ 100 A 1," the highest rating in its class. It was nine years old at the time of the voyage in question, on which occasion it was under time charter by the Canadian Transport Company, from the appellant.
Sounding pipes are used to ascertain the height of water in a ship's bilges. Each bilge has at least one such pipe running from the particular compartment up to the deck. On the Indien, the sounding pipes were located, as is usual, a few inches from the side of the ship. Their tops projected above the deck about two inches. By removing caps at the top of these pipes, a scaled sounding rod may be lowered to the bottom of the bilge, and the height of the water in the compartment determined.
The Indien loaded the ammophos at Warrens, N. J., in New York Harbor, and started on the voyage in question on January 5, 1929. Passing through the Panama Canal, she stopped at San Pedro, Cal., for fuel, and proceeded to Nanoose, British Columbia, where she completed her cargo by taking lumber in the 'tween-deck and on deck.
The motorship then called at Victoria, British Columbia, for fresh water, and sailed for Japan on February 2.
On February 7, the ship ran into a North Pacific winter storm. The weather increased in severity on February 8 and 9. Moller, the first officer of the Indien, testified that on the latter date the velocity of the wind "was along sixty miles [an hour] generally, and up to ninety miles in the gusts." Capt. Moloney, a marine surveyor, with a third of a century of maritime experience, declared that on a North Pacific voyage in the winter months, a "vessel is continually shipping heavy seas * * * on her deck," that February is considered one of the three worst months in those waters, that "there is nothing else to be expected except heavy gales," and that it is "a very stormy passage."
It was necessary in order to take the daily soundings on the morning of February 8 to haul the Indien off her course and run before the wind. On the following day, no soundings could be made at all.
The sounding pipe involved in this case was located on the starboard side of the after deck. The cap that was in the pipe at the time is in evidence. There are two holes in the top, into which the prongs of a spanner wrench are inserted to facilitate removal. The carpenter loosens the cap with the spanner, unscrews and removes it with his fingers, takes the sounding, replaces the cap, screws it in partly by hand and then retightens it with the spanner. On the Indien the carpenter would take soundings every morning. The process required about an hour and a half, since there were twenty-two sounding pipes on the ship.
Although no soundings could be made on February 9, Chief Officer Moller was on deck that morning and testifies that he saw the cap in place. He made his observation from above, since the deck cargo was at least 5 feet above the cap.
Some time between the hour of that observation and Sunday, February 10, the sounding pipe cap came out, and sea water flooded the bottom of No. 3 lower hold. As soon as the damage was discovered, on Sunday morning, the hold was pumped dry, and the cap, found lying on deck, about two and a half feet from the pipe, was replaced. The Indien continued her voyage, and at Kobe, Japan, the discharge of the ammophos revealed that the fertilizer had been damaged.
The parties are in sharp disagreement as to how the cap happened to come out. Lober, the ship's carpenter, was emphatic in his testimony that, after taking his sounding Friday morning, he tightened the cap with the spanner, just as he did with the other caps. There was no doubt in his mind about it.
The Indien's log thus explains the occurrence:
"It is supposed that it has been loosened by a piece of dunnage wood lying close to the sounding pipe, so that the seas continually must have been carrying it against the pipe ends in a socket about 2 inches above the *755 deck * * * with its circumference in line with the outside of the sounding pipe  without having the possibility to float away  sticking so far underneath the deck cargo  but without that the deck cargo rested on it  that it could not escape over the ship's side, the latter being about nine inches high, and neither forward nor abaft, there sticking against an airpipe and a stay and here against a fair leader.
"This piece of wood was on top of another piece lying fore and aft, so that these two pieces formed a cron [crane?], and in a way made a lever, which with its short arm pointed upon the sounding pipe, and in the past two days' bad weather, when the deck cargo sometimes was being lifted clear of the deck, may have acted as that upon the cover."
The loose piece of dunnage was what is known as an "athwartships" board, which will be more fully discussed later. One corner of it was worn off.
Despite the fact, however, that the carpenter was its own witness, and the log was its own exhibit, the appellant asserts that it does "not believe that the cap was unscrewed by the dunnage board," but that it is "convinced" that the cap "came out primarily because the ship's carpenter, whose duty it was to take daily bilge soundings, failed to properly screw it in the pipe the last time he sounded during the storm, prior to the entry of the sea water."
Relying upon the provisions of section 3 of the Harter Act (46 USCA § 192), the appellant continues: "If this was the proximate cause of the damage, it amounted to an error in management of the vessel and if the `Indien' was seaworthy, or reasonably fit for the voyage, her owners cannot be liable."
Elsewhere in its brief, however, the appellant concedes, on the authority of May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft (The Isis), 290 U. S. 333, 351, 54 S. Ct. 162, 167, 78 L. Ed. 348, that "failure to exercise due diligence to make a vessel seaworthy deprives the vessel of the benefit of section 3 of the Harter Act [46 USCA § 192], regardless of causal connection between the unseaworthiness and the damage."
In the Isis Case, supra, Mr. Justice Cardozo cited the opinion of the District Judge in the instant case, The Indien, 5 F. Supp. 349, 1933 A. M. C. 1342, as one of the decisions "supported by the better reasons" on this point, and used the following language: "There would be no end to complications and embarrassments if the courts were to embark upon an inquiry as to the tendency of an unseaworthy defect to aggravate the risk of careless navigation."
Therefore, if it is shown that the Indien was unseaworthy in any material respect, it will be unnecessary to determine whether the damage was caused by such unseaworthiness or by perils of the seas, or by an "error in management" resulting from the carpenter's alleged failure to replace the cap securely.
Accordingly, we next address our attention to the crucial question of seaworthiness.
At the outset, it must be borne in mind that the burden of proving the vessel's sea worthiness rests upon the shipowner. Any doubt must be resolved against him, "with the presumption in favor of the appellee that it was the fault of the appellant." The Jeanie (C. C. A. 9) 236 F. 463, 470.
In The Wildcroft, 201 U. S. 378, 388, 389, 26 S. Ct. 467, 468, 50 L. Ed. 794, some water, as in the instant case, found its way into hold No. 3 and elsewhere, and damaged a cargo of soluble merchandise, namely, sugar. In that case the Supreme Court held that "the ship was seaworthy in all respects at the beginning of the voyage, and it was a careless and recent opening of the valve or valves, shortly before the fresh water was let in, which resulted in the damage complained of." In deciding the case, however, Mr. Justice Day delivered an illuminating exposition of the rules governing the burden of proof as to seaworthiness and the defense of fault or error in management, which is of assistance to us in the instant case:
"The relief afforded by the third section of the Harter act [46 USCA § 192] to the owner of a vessel transporting property is purely statutory. In the case at bar there could be no question as to the liability of the vessel owner from the established facts of the case, but for the immunity afforded by that act. To permit a cargo of sugar to be injured by the introduction of fresh water in the manner shown, but for the provisions of this act, would have made a case of clear liability against the owner; and where the statute has given immunity against such loss by reason of error in navigation or management, it does so upon the distinct condition that the owner shall show that the vessel was in all respects seaworthy and properly manned, equipped, and supplied for the voyage; or, if this cannot be established, that he has used due diligence to obtain this end. The discharge of this duty is not left to any presumption in the absence of proof. It is the *756 condition precedent, compliance with which is required of the vessel owner in order to give him the benefit of the immunity afforded by the act. The reason for requiring this proof by the owner is apparent. He is bound to furnish a seaworthy and properly equipped ship for the purpose of the voyage. Whether he has done so is a matter peculiarly within his own knowledge. The inspection which he can give, but which the shipper cannot give, for lack of opportunity, will establish whether this duty has been complied with. The whole matter is in the control of the owner. The law says, in substance, that when the owner can show that he has discharged this duty he shall be relieved from errors of navigation and management on the voyage, over which he has not such direct control. It is not a case where there is either the necessity or propriety of resorting to presumptions. It is only when he has discharged the burden which the law imposes upon him, and shown that he has furnished a vessel, fit and seaworthy, or has used due diligence to that end, that the law relieves him of the liability which he would otherwise incur. This construction of the statute has been more than once announced in the decisions of this court; recently in International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830, 833, in which this court, speaking through Mr. Chief Justice Fuller, said: `We repeat, that even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions.' This case was quoted and followed in the still later case of The Southwark [191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65], supra, in which it was reiterated that the burden was upon the vessel owner to show by reasonable and proper tests that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried, and that if, by failure to adopt such tests and furnish the required proof, the question of the ship's seaworthiness was left in doubt, that doubt must be resolved in favor of the shipper, because the vessel owner had not sustained the burden cast upon him by the law to establish that he had used due diligence to furnish a seaworthy vessel."
See, also, May v. Hamburg, etc., Aktiengesellschaft, supra, at pages 346, 347 of 290 U. S., 54 S. Ct. 162; California & Hawaiian Sugar Refining Corp. v. Rideout (C. C. A. 9) 53 F.(2d) 322, 324, 325, and the many cases there cited.
From the foregoing, it will be seen that, in a case like this, the problem before the chancellor is not that of a nice balancing of evidence, pro and con, on delicate scales. After a careful study of the testimony and the exhibits, he must, in order to find for the shipowner, be convinced beyond at least a substantial doubt that the vessel was in fact seaworthy.
Such, then, was the task before the District Judge; and such is the task before us now.
One of the major attacks upon the seaworthiness of the Indien made by the appellee is in the matter of dunnaging the deck cargo of lumber. Since this is a matter of somewhat specialized nautical technique, regarding which the experts in the court below differed, some preliminary explanation is necessary.
In the first place, proper stowage of cargo is part of a vessel's seaworthiness. Section 1 of the Harter Act (46 USCA § 190) provides that "It shall not be lawful for the * * * owner of any vessel * * * to insert in any bill of lading * * * any clause * * * whereby * * * he * * * shall be relieved from liability for loss or damage arising from * * * failure in proper * * * stowage."
In The Tabor (D. C.) 274 F. 880, affirmed (C. C. A. 2) 284 F. 1022, the court said: "Under section 3 of the Harter Act [46 USCA § 192] the vessel would not be liable on the bill of lading unless unseaworthiness be shown by improper stowage, due to lack of a supply of proper dunnage, and to the fault of the stevedores in placing the same."
See, also, Oxford Paper Co. v. The Nidarholm, 282 U. S. 681, 684, 685, 51 S. Ct. 266, 75 L. Ed. 614; The Lake Fontanet (C. C. A. 5) 288 F. 544, 546; The Koan Maru (D. C.) 251 F. 384, 386; Crooks v. The Fanny Skolfield (D. C.) 65 F. 814, 815; In re Crockett et al., 6 Fed. Cas. page 836, No. 3,402.
And proper dunnage is an element of proper stowage.
In The La Drome (three cases) (D. C.) 43 F.(2d) 241, 243, Judge Augustus N. Hand brought his opinion to a close in the following language: "In view of the foregoing, I have reached the conclusion that there is proof of negligence in custody and stowage of cargo by reason of the failure to furnish proper dunnage, and I accordingly *757 grant an interlocutory decree to libelants with the usual reference."
See, also, The Howden, 12 Fed. Cas. pages 655, 656, No. 6,765; The Sloga, 22 Fed. Cas. pages 345, 348, 349, No. 12,955; The Tommy (D. C.) 16 F. 601, 604, 605, 607; Marx v. The Britannia (D. C.) 34 F. 906, 907; The Earnwood (D. C.) 83 F. 315, 320; The Victoria (D. C.) 114 F. 962, 963; The Lake Wilson (D. C.) 300 F. 808, 809, affirmed (C. C. A. 2) 300 F. 810; The Oakley C. Curtis (C. C. A. 2) 4 F. (2d) 979, 981, certiorari denied 267 U. S. 599, 45 S. Ct. 354, 69 L. Ed. 807; The Edith (two cases) (C. C. A. 2) 10 F.(2d) 684, 685.
We advert next to the nature and requisites of dunnage in general, and to the manner in which it was practiced in the instant case.
Dunnage is wood, mats, or other materials used to keep cargo clear of the deck or hull of a ship. On deck, dunnaging is used also to facilitate drainage.
It is highly important that dunnage boards should not "foul" the sounding pipes; that is, should not lie too close to the pipe and "prevent the carpenter from taking his soundings in the proper way."
The deck load on the Indien consisted of "generally very heavy lumber up to 24 by 24 inches, and up to 40 feet long." This part of the cargo contained 1,183,847 board feet. The bulk of the lumber was loaded in the 'tween-deck spaces, but 425,343 board feet of it was built into a deck load on the ship's awning deck.
According to Chief Officer Moller, the dunnage on the after deck was laid in the following manner:
Strips of wood, 1½ by 6 inches, and 3 to 4 feet long, were placed end to end along the outer edge of the deck, just inside the stanchion sockets. These pieces are called "fore and aft," "long ship" or "wing" dunnage. They were laid end to end 1 or 2 feet apart, to allow for drainage.
At right angles to those boards, with their outer ends resting on the latter, were laid the "athwartships dunnage"  boards of 1 inch by 4 or 6 inches, and about 12 to 14 feet in length. These pieces were laid at intervals of 3 or 4 feet.
While, as we have just stated, the outer ends of the athwartships dunnage boards were resting on the fore and aft boards, the inboard ends rested upon the deck itself. This was to compensate for the ship's "camber," or crown, which is the convex are of a vessel's deck from side to side. Camber facilitates the drainage of the water into the scuppers, or openings in the ship's bulwarks By raising the outer tier, "level stowage" was secured, according to Moller.
After the dunnage was in place, the lumber was laid thereon starting from the hatches and working out toward the ship's side. The lumber was laid in a fore and aft direction, and, when one layer was finished, the operation was repeated, on top of the hatches, "all over the winches, covering the whole deck." The lumber cargo was then secured with chains and turnbuckles.
The deck load on the after deck was piled up nearly 6 feet in the "fore part" and less than 5 feet in the "aft part."
We have seen that allowance was made for the ship's camber, although Capt. Moloney declared that a single line of such dunnage "would not take the camber out of" the deck.
Be that as it may, the deck of a ship has another curve, for which no allowance was made in laying the dunnage The curve to which we refer is "sheer"  the sweeping concave are of a vessel's deck from bow to stern.
The Indien's sheer was variously characterized by one of the appellant's own witnesses as "good," "large," "more than the average," and "exceptional." A qualified naval architect, likewise called by the appellant, computed the maximum sheer over the entire after deck to be 6¼ inches, and, in a 40-foot section, ¾ inch. While conceding that the testimony variously gave the after deck sheer from 6 to 8 inches, the appellant, in its brief, states that "the most accurate computation made from the blue print placed it at 6½ inches."
The appellant, however, minimizes the importance of allowing for sheer, saying that it "was immaterial, as is evidenced by the fact that the dunnage generally stayed well in place," and emphasizes that "The real proof that the method was sufficient to hold the dunnage in place is the fact that despite the weather encountered, during which the deck load continually strained at its lashings, only at two places under the entire deck load did any dunnage shift and only at one place did it become loose."
A study of the decisions on the subject, however, discloses that this sort of argument is double-edged.
In Marx v. The Britannia, supra, the same contention must have been brought forward, for in that case the court said: "Had there been a general disarrangement of the *758 wood, or had it dropped away between other drums, the proof of such facts, together with the proof of general good stowage, might have warranted the inference that the disarrangement and dropping out of the wood was caused solely by the severe weather, a peril of the sea, which is also within the exceptions of the bill of lading; and not by any defect in securing the wood of these two packages. But the mate's testimony that on arrival the wood had not dropped away from any others except the two injured, will not permit the inference that it arose from rough weather alone; since in that case the wood between other drums would have been similarly affected. The only fair inference of fact is that the wood between these two drums was not secured in the usual and proper manner, and that negligence in this respect was the cause of the wood's dropping out, and thereby of the leakage which caused the loss. [Cases cited.]"
The appellant emphasizes that "The ship's officers testified that the `Indien' was seaworthy in every respect," and that, according to three of them, "The method of arrangement used on the `Indien' has been used for years and has been quite satisfactory."
While we have no intention of impugning the good faith of the ship's officers, it is well to remember that, when they gave their depositions, they had an interest in the outcome of the lawsuit against their employer. This is certainly an element to be borne in mind in weighing their testimony.
A comment made by the appellant in its brief indicates that it recognizes the crew's susceptibility to be influenced in their statements by the interests of their employer. With reference to the entry in the log book attributing the unscrewing of the sounding pipe cap probably to the action of the dunnage board, instead of to the fault of the ship's carpenter, the appellant observes that the officers were "undoubtedly persuaded at the time by the thought that any negligence of those on board would be imputable to the owners and make the vessel liable, for these Danish seamen did not know our law."
We turn next to the specific criticism chiefly relied upon by the appellee in connection with the dunnaging aboard the Indien.
It will be recalled that some of the timbers were as long as 40 feet, and that, as conceded by the appellant, the sheer on the after deck for that distance would be three-fourths of an inch.
Capt. Moloney, an expert witness of unquestionable seamanly qualifications, pointed out that the middle of a "stick" 40 feet long would not touch the dunnage laid on a deck of the Indien's sheer, and that, in order for the middle of the timber to be supported, thicker pieces of dunnage would have to be used. Capt. Moloney further said that a 40-foot timber would not bend, but that, unless thicker dunnage were used at its middle, "It would be touching [the deck] at the forward and after end, but the middle of it would be unsupported." As we have seen, the appellant's figures would indicate that this clearance of the middle of the timber from the dunnage would be about three-fourths of an inch.
Similar testimony as to this same undesirable clearance of the dunnage was given by Anderson, a master stevedore, and by Capt. Rees, a master mariner of thirty-eight years' maritime experience. Capt. Rees recommended the use of "filling-in pieces, shims, in other words, to lift that dunnage up so that a long timber would have a bearing on all of the cross-pieces," and said that the drifting of the athwartship dunnage board in question "was caused by not shimming up the other dunnage to get these timbers so that they all rested on the deck and locked the dunnage in place."
The appellant adduced considerable evidence tending to show expert "approval" of the method of dunnaging that obtained on the Indien. Nothing would be gained by attempting to rehearse that evidence here. Suffice it to say that it is not difficult to find disagreement among experts as to almost any point of nautical and stevedoring technique. But, after a careful study of the voluminous exhibits and the 800 pages of printed record, we find, as the learned judge below found, that the appellant has not proved that its method of dunnaging was adequate for a voyage in the North Pacific in midwinter. Some attempt, at least, should have been made, we think, to compensate for the Indien's unusual sheer. The record is barren as to any such attempt, which would have at least tended to show some degree of diligence. Instead, the appellant has relied upon testimony that "allowance for sheer was unnecessary" and "immaterial."
Much is said by the appellant relative to the fact that the Indien's dunnage practice was one that had been "customarily" employed, by the appellant and others, according to "all precedents of practical navigation *759 and seamanship." But mere custom, without more, under the law, is not conclusive. As Mr. Justice Holmes observed in Texas & Pacific Ry. Co. v. Behymer, 189 U. S. 468, 470, 23 S. Ct. 622, 623, 47 L. Ed. 905: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."
"* * * Negligence, if established, cannot be justified by custom." Elkton Auto Sales Corporation v. Maryland (C. C. A. 4) 53 F.(2d) 8, 10.
See, also, United States v. M. Levy's Sons (The Lake Fontanet) (C. C. A. 5) 288 F. 544, 546; The Charles Rohde (D. C.) 8 F. (2d) 506, 507; The T. J. Hooper (C. C. A. 2) 60 F.(2d) 737, 740; United States Radiator Corporation v. Henderson (C. C. A. 10) 68 F.(2d) 87, 92.
The appellant relies chiefly upon three District Court decisions as being "quite like the present case" and "expressing so clearly the legal principles involved." We will here pause to point out only a few of the more salient dissimilarities between those cases and the present suit.
The decision principally stressed by the appellant is The Newport News (D. C.) 199 F. 968, 969. There the flange of the sounding pipe, which the court found to be substantially its top, rose "perhaps an eighth to a quarter of an inch above the deck." Here, as we have seen, the top of the sounding pipes projected about 2 inches above the deck. It is clear that the sounding pipes of the Indien furnished a much better target for the action of deckload or dunnage than did those aboard the Newport News. But, without further enumerating the other points of difference, which will occur to the most casual reader of that decision, we advance at once to what we conceive to be the controlling distinction. In that case, the court found that there was "nothing in the case to contradict the statements from the ship that it was well and sufficiently stowed, securely lashed and shored, and arranged in a seamanlike and customary manner." In the instant case, there is considerable expert testimony "to contradict the statements from the ship that" the deck load "was well and sufficiently stowed." We have carefully read every word of the Newport News decision, and we do not find the barest mention either of faulty dunnage or of sheer. In a word, the problem before the District Judge in that case was altogether different from that which confronts us here.
Similarly, the other two cases relied upon by the appellant are clearly distinguishable on the facts. In both The Carisbrook (D. C.) 247 F. 583, and Kalbfleisch Corporation v. United States (D. C.) 53 F.(2d) 867, the negligence of members of the respective crews was clearly shown, as may be seen from the appellant's own recital of the facts. In the instant case, as we have already shown, the appellant's contention that the ship's carpenter was negligent and that therefore, under the Harter Act (46 USCA § 190 et seq.), the shipowner is exempt, is not only unsupported by the evidence, but is in direct contradiction to the appellant's own logbook and the appellant's own witness, the ship's carpenter himself. We cannot accept what counsel choose to believe, in the face of the plain and uncontradicted evidence introduced by them.
The other major assault made by the appellee upon the Indien's seaworthiness is on the ground of overloading.
The bow and stern drafts noted in the Indien's logbook, when the ship left Victoria, were 25 feet 6 inches forward, and 28 feet 3 inches aft. Capt. Moloney took the mean of these, 26 feet 10½ inches, and declared it to be her draft amidships. This is the proper way of ascertaining draft amidships.
Plimsoll marks, or load lines, are painted on each side of most seagoing vessels, amidships. The mark is a design consisting of a circle transected by a horizontal line to the right of which there are a few horizontal lines with a vertical crossbar at the left. The load line is intended as a guide to determine the safe loading depth under various conditions.
Capt. Moloney calculated from the ship's blueprint that the Indien's winter load line would be 26 feet 6¼ inches. From Lloyd's Register, he computed her "winter draft" as 26 feet 7½ inches.
Therefore, when the Indien left Victoria, she was loaded below her Plimsoll mark 4¼ inches according to blueprint diagram, or 3 inches according to Lloyd's Register. The appellant asserts that it believes the official mark in Lloyd's Shipping Register to be correct, but adopts the blueprint figure "for the purposes of this discussion."
The appellant attempts to explain away this "apparent discrepancy" in various ways. First, counsel minimize the importance of draft in determining load lines. They assert that "freeboard, rather than draft, is the feature considered by classification societies *760 in assigning loadline marks," and that "Draft is not even mentioned in the certificates." But "corresponding draught" is mentioned in Lloyd's Register. And since the official freeboard certificates introduced in evidence by the appellant specify the Indien's freeboard as 9 feet 9 inches from the awning deck to the center of the Plimsoll disc, or the summer load line mark, it is obvious that the greater the draft, the smaller the freeboard, and vice versa. This is what is meant by corresponding draft.
Furthermore, the draft of a vessel determines whether or not she is safely loaded. In The Benjamin Noble, 232 F. 382, at page 391, supra, the court said:
"What a captain usually does when he wants to know whether the ship is being overloaded, or not, is to watch her draft. If the owners want to advise a new captain, they tell him the safe draft. There are liable to be grave mistakes if anything else determines. Owners of freight, owners of vessels, and members of the crew may be anxious to carry large cargoes. By intention or mistake there may be errors as to the tonnage. The guiding thing ought to be the draft, rather than the cargo."
In the instant case, the "safe draft" was shown by the winter Plimsoll mark. The appellant's freeboard v. draft argument is not impressive, either as a matter of law or of practical seamanship.
Next, apparently disregarding the doctrine enunciated in The Benjamin Noble, supra, to the effect that "there are liable to be grave mistakes" if anything other than the draft determines the safe load line, the appellant launches into an elaborate discussion of the Indien's "actual weight on board," in the effort to show that the ship "was seaworthy as regards her load." The wisdom of the observations regarding the danger of "grave mistakes" if one relies on tonnage computation in arriving at a decision as to safe loading is apparent if one studies the involved explanations on this subject in both the appellant's and the appellee's briefs. We are led through a maze of argument as to whether the water was salt or fresh, whether the lumber was damp or dry, whether baggage should have been included, etc.
We prefer to rest our determination of whether or not the Indien was overloaded upon the load line marks as established by Lloyd's Shipping Register, according to which, as we have seen, the ship was overloaded by 3 inches when she left Victoria.
A third attempt at explanation of the ship's "apparent" overloading is made by the appellant. It is urged that "an elastic condition * * * obtains in the `Indien.'" When loaded, the ship, we are told, becomes "hogged" or bowed, so that the center rises slightly, or the ends sag slightly, in the water. We are further assured by the appellant that the Indien is not permanently hogged, but is only thus affected when carrying a deck cargo on the fore and after decks. "The `Indien's' hog is very slight, not over 4 to 4½ inches."
It would unduly lengthen this opinion to recite the various facts, figures, and experiments relied upon to sustain this theory, or the various data and arguments adduced to refute it. Suffice it to say that we are not impressed with the showing made by the appellant in this respect, and agree with the lower court in its holding that the appellant's evidence "is rebutted by experts called by libelant [appellee] and * * * is not strong enough to remove the doubt that is created by the log entries and measurements that the ship was overloaded when she left Victoria."
Furthermore, we agree with the observation made by one of the appellee's experts that a steel vessel with the hog claimed for the Indien is actually overloaded when she is down to her Plimsoll mark, with her bow and stern 4 inches lower than the midships section. This is for "the reason that to place * * * the Plimsoll mark in its correct position relative to the fore and aft marks on the stem and stern, it would be necessary to bring it down, to get a straight line through the draft marks on the stem and stern and the Plimsoll mark." The expert who expressed this view was a surveyor for the American Bureau of Shipping, or American Classification Society, which places Plimsoll marks on vessels, on data furnished by its surveyors. We believe that his opinion, apparently disinterested, is entitled to weight.
Finally, the appellant argues that "In recent years it has been determined that vessels carrying timber deck cargoes are entitled to load more deeply than vessels carrying entirely underdeck cargoes." While conceding that the present American load line legislation, passed March 2, 1929 (46 USCA § 85 et seq.), "has no bearing on this case," the appellant proceeds to attempt to draw various analogies from the Load Line Act. Since there is no showing that the Indien would conform to the standards laid down by the regulations established by the Secretary of *761 Commerce under the mandate of that act (46 USCA § 85a), we believe that it would be going far afield to consider that legislation, even by analogy.
There is considerable testimony in this case to the effect that loading a vessel of the Indien's type so far below her Plimsoll mark is a dangerous practice. Capt. Moloney asserted that such a ship, so loaded "is logy; she is dead; she don't answer her rudder easily; she rolls heavier; she pitches heavier; and on this particular vessel, where the largest part of this weight was in the after end of her, it would tend to submerge her stern in a sea wave."
Capt. Moloney was quite emphatic about this, for he continued:
"She is dead in the water then; she don't jump back; she don't shake herself clear of the water; the water remains on her for a long period. Where the vessel has the full reserve buoyance she more or less, as the saying is, shakes herself clear."
And, testifying for the appellant, Chief Officer Moller indicated that the Indien experienced just the difficulties pointed out by Capt. Moloney:
"The waves were very high, high rollers, continually breaking over the ship, especially the poop and aft deck, burying the whole aft deck and the deckload underneath the water * * * the seas lifted the deck cargo right clear from the deck so that it threatened to break the chain lashings."
There is no suggestion that Capt. Moloney had any interest in the outcome of this litigation; and his qualifications, a statement of which occupies five pages of the apostles, entitle his views to considerable weight. The veteran seafarer earnestly elaborated upon the importance of adhering to the Plimsoll mark in loading a vessel:
"* * * It is put there to show the extreme limit to which she can be loaded, and anybody that attempted to say a vessel would be more seaworthy with that mark submerged after a number of experts have arrived at where the mark should be placed, is just talking a lot of foolishness. * * *
"The reserve buoyancy is figured out when that [Plimsoll mark] is put on, and that means that `thus far shalt thou go, and no further,' in the loading of the vessel, because when you submerge that mark and go out on the open ocean, you are stealing from the ship's reserve buoyancy. * * * No, that is not my interpretation; that is the interpretation of everybody; that is the interpretation given in Lloyd's rules, the interpretation as given in the Bureau of Veritas, the interpretation given by Danish Lloyd's, and, in fact, every classification system in the world gives the same interpretation of the Plimsoll mark. Our own American Bureau gives exactly the same interpretation. It is the mark that shows the deepest the vessel can be loaded to with safety."
This emphatic insistence upon the controlling importance of Plimsoll marks would alone be sufficient to create in our mind the "doubt" as to the ship's seaworthiness referred to in the books.
The appellant, on the other hand, introduced testimony to the effect that a vessel, especially one of the Indien's type, is seaworthy when loaded as much as 4¼ inches below her winter Plimsoll marks, and that "A vessel loaded three inches below her draft is absolutely seaworthy, particularly with a deck cargo of lumber."
But one of the witnesses so testifying, himself an operator of thirteen lines of ships, or twenty to thirty vessels per month, hastened to add that his boats never sail with their load lines 4¼ inches under water, and that he adheres "rigidly to the load lines as provided by law."
All in all, we believe that the appellant has, to say the least, "left in doubt" the seaworthiness of the Indien, with respect to loading. The Wildcroft, supra, 201 U. S., at page 389, 26 S. Ct. 467, 50 L. Ed. 794.
The appellant contends that "It is ridiculous to maintain that it can be determined whether a ship is seaworthy or unseaworthy by simple reference to such things as her loadline," but it concedes that "At most that would be merely evidence for consideration." That overloading is "evidence for consideration" in the matter of seaworthiness vel non is well supported by the decisions.
In The Benjamin Noble, supra, 244 F. 95, at page 97, the Circuit Court of Appeals for the Sixth Circuit approved the statement, "That the overloading a vessel renders her unseaworthy, there can be no doubt."
And as to the importance of load lines, to which the appellant apparently does not attach much weight, the court in The Vestris (D. C.) 60 F.(2d) 273, 279, 280, said:
"That vessels could only be loaded with safety to a certain depth has been known and recognized by sea-faring nations for many centuries. Load line marks upon vessels were established and officially recognized by the members of the Hanseatic League. * * * The standard of the British Board of Trade relating to the determination and *762 the affixing of the load line is the result of many years of experience, and the history of the mariners and the shipbuilders of England is one to inspire confidence in their knowledge and skill in such matters. The weight of the testimony is that it represents a correct measure of safety. Standards for load line marks substantially similar to those of the British are used by many of the seafaring nations, and there is a mutual recognition of each other's freeboard certificates."
Finally, the appellee criticizes the Indien's seaworthiness on the ground of excessive trim by the stern. The trial court did not consider this issue in its memorandum opinion, and the appellee did not tender a formal finding thereon. In view of our present holding that the appellant has not discharged its burden of proof as to the Indien's seaworthiness in the matter of dunnage and of loading, we deem it unnecessary to pass upon the question of trim.
Much has been said in the briefs about the dangers of the sea, which the appellant insists were encountered by the Indien. But this court and other courts have repeatedly held that the question of perils of the sea becomes important only after the shipowner has established the seaworthiness of his vessel, or due diligence with respect thereto. The Rideout Case, supra, at pages 324, 325, of 53 F.(2d), and the many cases there cited. Having found that the appellant has not sustained this burden as to seaworthiness, we do not go into the question of dangers of the sea.
Decree affirmed.